Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Michael Vanunu (MV 4167)
Philip P. Nash (PN 0519)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and        Docket No.:_____ (     )
GEICO CASUALTY COMPANY,

                       Plaintiffs,        **Plaintiff Demands a Trial by Jury**

      -against-

MEDICAL SUPPLY DEPOT GROUP CORP.,
NIKOLAY MALININ, and JOHN DOE
DEFENDANTS 1-10,

                       Defendants.
----------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

      1.     This action seeks to recover more than $114,000.00 that the Defendants have

wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of

fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise

non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. cervical collars, lumbar-sacral supports, orthopedic pillows, massagers, electronic heat pads, egg crate mattresses, etc.) (collectively, the "Fraudulent Equipment") through Defendant Medical Supply Depot Group Corp. ("Med Supply").

2.      Med Supply is a retailer of DME and OD that is owned, operated and controlled by Nikolay Malinin ("Malinin"). In short, Malinin devised a scheme in conjunction with others who are not readily identifiable to GEICO to obtain prescriptions from various healthcare providers (the "Referring Providers") in order to submit large volumes of billing to GEICO and other New York automobile insurance companies for providing Fraudulent Equipment that was medically unnecessary, illusory, and otherwise not reimbursable.

3.      Based upon prescriptions for Fraudulent Equipment issued by the Referring Providers, Med Supply and Malinin (collectively the "Defendants") allegedly provided Fraudulent Equipment to individuals who claimed to have been involved in automobile accidents in New York and were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds").

4.      GEICO seeks to recover more than $114,000.00 that has been wrongfully obtained by the Defendants and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $800,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Med Supply because:

(i)      The Defendants billed GEICO for Fraudulent Equipment when they were ineligible to collect No-Fault Benefits because they failed to comply with local licensing requirements;

(ii)     The Defendants billed GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of unlawful financial arrangements with others who are not presently identifiable;

(iii)    The Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and provided – to the extent that any Fraudulent Equipment was provided – pursuant to prescriptions issued by the Referring

Providers as a result of predetermined fraudulent protocols, which were solely to financially enrich the Defendants and others not presently known rather than to treat the Insureds;

(iv)     The Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent that any Fraudulent Equipment was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions;

(v)      The Defendants billed GEICO for Fraudulent Equipment purportedly provided to Insureds when the Fraudulent Equipment was never actually provided to Insureds;

(vi)     To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds.

(vii)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

5.       The Defendants fall into the following categories:

(i)      Defendant Med Supply is a New York corporation that purports to purchase DME and OD from wholesalers, purports to provide Fraudulent Equipment to automobile accident victims, and bills New York automobile insurance companies, including GEICO, for Fraudulent Equipment.

(ii)     Defendant Malinin owns, operates and controls Med Supply, and uses the corporation to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims.

(iii)    John Doe Defendants 1-10 are citizens of New York and are presently not identifiable but are associated with the Referring Providers and various multi-disciplinary medical offices where the Prescribing Providers operate from that purportedly treat high-volume of No-Fault insurance patients (the "Clinics"), and who have conspired with the Defendants to further the fraudulent schemes against GEICO and other automobile insurers.

6.       As discussed below, the Defendants always have known that the claims for

Fraudulent Equipment submitted to GEICO were fraudulent because:

(i)      The bills for Fraudulent Equipment submitted by the Defendants to GEICO fraudulently misrepresented that the Defendants complied with all local licensing requirements when the Defendants were not lawfully licensed to provide the Fraudulent Equipment by the New York City Department of Consumer Affairs;

(ii)     The Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – based upon prescriptions received as a result of unlawful financial arrangements between the Defendants and others who are not presently identifiable and, thus, not eligible for no-fault insurance reimbursement in the first instance;

(iii)    The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – pursuant to predetermined fraudulent protocols designed at each Clinic solely to financially enrich the Defendants and others not presently known rather than to treat or otherwise benefit the Insureds;

(iv)    The bills for Fraudulent Equipment submitted by the Defendants to GEICO fraudulently misrepresented that the Defendants provided Fraudulent Equipment to Insureds when the Insureds never received those items;

(v)     The Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions;

(vi)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Defendants to GEICO – and other New York automobile insurers – fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds as the HCPCS Codes identified in the bills did not accurately represent what was actually provided to Insureds; and

(vii)   To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Defendants to GEICO – and other New York automobile insurers – fraudulently and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

7.     As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through Med Supply.

8.      The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to the Defendants' fraudulent scheme.

9.      Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began no later than April 25, 2019 and the scheme has continued uninterrupted as the Defendants continued to seek payment on the fraudulent charges submitted to GEICO.

10.     As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $114,000.00.

## THE PARTIES

### I.      Plaintiffs

11.     Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.     Defendants

12.     Defendant Med Supply is a New York corporation with its principal place of business in Brooklyn, New York. Med Supply was incorporated on May 7, 2019, is owned, operated and controlled by Malinin, and has been used by Malinin, with the assistance of others not presently identifiable by GEICO as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.     Defendant Malinin resides in and is a citizen of New York.  Malinin is not and has never been a licensed healthcare provider. Malinin owns and controls Med Supply and entered into unlawful financial arrangements with others who are not presently identifiable in order for Med

Supply to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers.

### III.    Other Pertinent Individuals

14.    Though not named as Defendants in this action, the identification of several of the Referring Providers is relevant to illustrate the unlawful financial arrangements between the Defendants and others who are not presently identifiable and the predetermined fraudulent protocols that were used as a basis to provide the Defendants with prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers.

15.    William Elton, M.D. ("Elton") is a physician who is licensed to practice medicine in New York. Elton purportedly treated automobile accident victims at a multi-disciplinary medical office located at 90-16 Sutphin Boulevard, Jamaica, New York (the "Sutphin Blvd. Clinic") that catered to a high volume of no-fault insurance patients.  Elton was one of the Referring Providers who purportedly issued prescriptions for Fraudulent Equipment from the Sutphin Blvd. Clinic, which were provided to and used by the Defendants to bill GEICO for part of the fraudulent claims identified in Exhibit "1".

16.    Hewitt Steinberg, D.C. ("Steinberg") is a chiropractor licensed to practice chiropractic medicine in New York.  Steinberg purportedly treated automobile accident victims at the Sutphin Blvd. Clinic. Steinberg was one of the Referring Providers who purportedly issued prescriptions for Fraudulent Equipment from the Sutphin Blvd. Clinic, which were provided to and used by the Defendants to bill GEICO for part of the fraudulent claims identified in Exhibit "1".

17.    Muhammad Zakaria, M.D. ("Zakaria") is a physician who is licensed to practice medicine in New York.  Zakaria purportedly treated automobile accident victims at a multi-

disciplinary medical office located at 1568 Ralph Avenue, New York (the "Ralph Ave. Clinic") that catered to a high volume of no-fault insurance patients. Zakaria was one of the Referring Providers who purportedly issued prescriptions for Fraudulent Equipment from the Ralph Ave. Clinic, which were provided to and used by the Defendants to bill GEICO for part of the fraudulent claims identified in Exhibit "1".

18.     Giulio Caruso, D.C. ("Caruso"), a chiropractor licensed to practice chiropractic medicine in New York.  Caruso purportedly treated automobile accident victims at the Ralph Ave. Clinic. Caruso was one of the Referring Providers who purportedly issued prescriptions for Fraudulent Equipment from the Ralph Ave. Clinic, which were provided to and used by the Defendants to bill GEICO for part of the fraudulent claims identified in Exhibit "1".

19.     Augustus Igbokwe, P.A. ("Igbokwe"), a physician's assistant who is licensed to practice in New York.  Igbokwe purportedly treated automobile accident victims at the Ralph Ave. Clinic. Igbokwe was one of the Referring Providers who purportedly issued prescriptions for Fraudulent Equipment from the Ralph Ave. Clinic, which were provided to and used by the Defendants to bill GEICO for part of the fraudulent claims identified in Exhibit "1".

20.     Joseph Raia, M.D. ("Raia") is a physician who is licensed to practice medicine in New York. Raia purportedly treated automobile accident victims at the Ralph Ave. Clinic.  Raia was one of the Referring Providers who purportedly issued prescriptions for Fraudulent Equipment from the Ralph Ave. Clinic, which were provided to and used by the Defendants to bill GEICO for part of the fraudulent claims identified in Exhibit "1".  In 2014, Raia reached a settlement with the Office of Inspector General for the U.S. Department of Health and Human Services that had alleged that Raia submitted false and fraudulent claims to Medicare for services that he never provided. As a result of the settlement, Raia was excluded from participating in all federal

healthcare programs for fifteen years and was required to pay $1.5 million in penalties. Additionally, Raia was implicated as a participant in the criminal prosecution entitled USA v. Rose; 1:19-cr-00789-PGG (S.D.N.Y. 2019), which involves a complex No-Fault insurance fraud scheme involving multiple Clinics, doctors, attorneys, laypersons, and runners.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

22.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

23.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

24.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

25.     GEICO underwrites automobile insurance in the State of New York.

I.      **An Overview of the Pertinent Laws**

   A.    **Pertinent Laws Governing No-Fault Insurance Reimbursement**

26.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

27.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

28.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

29.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

30.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

31.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

32.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

33.     Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME and OD.

34.     Specifically, New York City's Administrative Code requires DME/OD suppliers to obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer Affairs ("DCA") in order to lawfully provide DME or OD to the disabled, which is defined as "a person who has a physical or medical impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques". See 6 RCNY § 2-271; NYC Admin. Code §20-425.

35.     It is unlawful for any DME/OD supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products License.  See NYC Admin. Code §20-426.

36.     A Dealer in Products License is obtained by filing a license application with the DCA. The application requires that the applicant identify, among other pertinent information, the commercial address of where the DME/OD supplier is physically operating from.

37.     The license application for a Dealer in Products License also requires the applicant to affirm that they are authorized to complete and submit the application on behalf of the corporate entity seeking a license and that the information contained in the application is true, correct, and complete. The affirmation to the application requires a signature that is made under penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

38.     New York law also prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

39.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

40.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

41.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

42.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

43.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.      Pertinent Regulations Governing No-Fault Benefits for DME and OD**

44.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

45.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

46.     OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars, lumbar supports, knee supports, ankle supports, wrist braces, and the like.

47.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

48.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

49.     As it relates to DME and OD, the New York Fee Schedule sets forth the maximum charges as follows:

> (a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:
>
> (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or
>
> (2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2.

50.     As indicated by the New York Fee Schedule, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

51.     According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

52.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

53.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto. Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

54.     Where a specific DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

55.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

56.     To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items and the HCPCS Codes are not within the Medicaid DME Procedure Codes, the definitions for set forth by Palmetto control to determine whether an item of DME or OD qualify for reimbursement under a specific HCPCS Code.

57.     Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted and/or customized. Palmetto published a guide to differentiate between custom-fitted items and off-the-shelf, prefabricated items, entitled, <u>Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised</u>. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

58.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)     The provider is in compliance with all significant statutory and regulatory requirements;

(ii)    The provider received a legitimate prescription for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;

(iii)   The prescription for DME or OD is not based any unlawful financial arrangement;

(iv)    The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription;

(v)     The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(vi)    The fee sought for the DME or OD was not in excess of either the Medicaid Fee Schedule or the standard for a Non-Fee Schedule item.

## II.        The Defendants' Fraudulent Scheme

59.        Beginning in or about April 2019, the Defendants masterminded and implemented a complex fraudulent scheme in which Med Supply was used as a vehicle to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits that they were never entitled to receive.

### A.        Overview of the Defendants' Fraudulent Schemes

60.        Between April 2019 and April 2020, the last month for which Med Supply submitted new claims to GEICO, the Defendants, through Med Supply, submitted more than $1,300,000.00 in fraudulent claims to GEICO seeking reimbursement for Fraudulent Equipment. To date, the Defendants have wrongfully obtained more than $114,000.00 from GEICO, and there is more than $800,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Defendants continue to seek payment of from GEICO.

61.        Malinin used Med Supply to directly obtain No-Fault Benefits and maximize the amount of No-Fault Benefits he could obtain by submitting fraudulent bills to GEICO and other automobile insurers seeking reimbursement for Fee Schedule and Non-Fee Schedule items.

62.        The Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers because of secret agreements with third-party individuals who are not presently identifiable.

63.        Upon information and belief, the Referring Providers purportedly issued prescriptions for Fraudulent Equipment to virtually every Insured that was injured in a motor vehicle accident and treated at a particular Clinic, including the Sutphin Blvd and Ralph Ave.

Clinics, and many of those prescriptions would be provided to the Defendants in exchange for various forms of consideration from the Defendants.

64.     As part of the scheme, and in a way to maximize the amount of money that the Defendants could obtain from GEICO, and other automobile insurers, the prescriptions for Fraudulent Equipment that were purportedly issued by the Referring Providers and provided to the Defendants were generic and vague.

65.     Once the Defendants received the prescriptions purportedly issued by the Referring Providers, the Defendants would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for specific types of Fee Schedule and Non-Fee Schedule items with HCPCS Codes that were not directly identified in the prescriptions or that differed from the HCPCS Codes that were identified in the prescriptions.

66.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the Defendants indicated that they provided Insureds with the particular item associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a Referring Provider, who was licensed to prescribe DME and/or OD.

67.     However, and as part of the Defendants scheme to maximize the amount of money that they could obtain from GEICO, the Defendants billed GEICO for Fraudulent Equipment that was never actually provided to Insureds.

68.     In fact, the Defendants were able to frequently bill GEICO for Fraudulent Equipment never actually provided to Insureds because they submitted bills to GEICO for both Fraudulent Equipment provided to Insureds <u>and</u> Fraudulent Equipment that was never provided to Insureds.

69.     The Defendants were able to create a false appearance of legitimacy regarding the Fraudulent Equipment purportedly provided to Insureds because the bills submitted to GEICO were routinely submitted with delivery receipts that were purportedly signed by Insureds acknowledging receipt of the Fraudulent Equipment.

70.     However, as set forth in more detail below, many of the bills submitted to GEICO for Fraudulent Equipment contained fraudulent delivery receipts that were never actually signed by Insureds. Instead, the Defendants photocopied the Insureds' signatures in order to create a delivery receipt to support charges for Fraudulent Equipment billed to GEICO but never actually provided to Insureds.

71.     The Defendants also tried to maximize the amount of No-Fault Benefits that they could obtain from GEICO, and other automobile insurers, by submitting bills to GEICO that misrepresented the Fraudulent Equipment purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

72.     In a substantial majority of the charges for Fee Schedule items identified in Exhibit "1" – to the extent that any Fraudulent Equipment was actually provided to the Insureds – the Fraudulent Equipment for Fee Schedule items did not match the HCPCS Codes identified in the bills submitted to GEICO by the Defendants.

73.     As part of this scheme, the Defendants provided Insureds with inexpensive and poor-quality Fraudulent Equipment that did not contain all the features required by the HCPCS Codes for Fee Schedule items billed to GEICO, to the extent that any Fraudulent Equipment was provided to the Insureds in the first instance.

74.     For example, the Defendants used the intentionally generic and vague prescriptions to unlawfully choose one of many variations of Fee Schedule items that could be provided to the

Insureds, and then submitted bills to GEICO indicating that the Defendants provided the Insureds

with a variation that had a higher than necessary maximum reimbursement rate under the Medicaid

Fee Schedule.

75.     However, the Fee Schedule items actually provided did not match the HCPCS

Codes identified in the bills to GEICO as the items were of inferior quality and without the specific

features required by the applicable HCPCS Codes.

76.     Instead, the Fee Schedule items actually provided to Insureds – and again to the

extent that any Fraudulent Equipment was actually provided – would qualify under different

HCPCS Codes that had significantly lower maximum reimbursement rates than the HCPCS Codes

identified in the bills submitted by the Defendants.

77.     The Defendants engaged in a pattern of submitting bills to GEICO, and other

automobile insurers, seeking No-Fault Benefits based on HCPCS Codes that did not accurately

represent – sometimes in any way – the Fraudulent Equipment purportedly provided to the

Insureds in order to obtain higher reimbursement rates than what was permissible.

78.     In furtherance of their scheme to defraud GEICO, and other automobile insurers,

the Defendants also submitted bills for Non-Fee Schedule items that falsely indicated they were

seeking reimbursement at the lesser of 150% of the Defendants' legitimate acquisition cost or the

cost to the general public for the same item.

79.     In actuality, the bills from the Defendants submitted to GEICO for Non-Fee

Schedule items contained grossly inflated reimbursement rates that did not accurately represent

the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public.

80.     As part of this scheme, the Defendants submitted bills to GEICO with

reimbursement rates that indicated the Non-Fee Schedule items purportedly provided Insureds

were expensive and high-quality when the Non-Fee Schedule items provided were cheap and poor-quality and were purchased from wholesalers for a small fraction of the reimbursement rates contained in the bills.

81.     In fact, the cheap and poor-quality Non-Fee Schedule items provided to the Insureds – again, to the extent that any Non-Fee Schedule item was actually provided – were easily obtainable from legitimate internet or brick-and-motor retailers for a small fraction of the reimbursement rates identified in the bills submitted to GEICO by the Defendants.

82.     The Defendants submitted bills to GEICO, and other automobile insurers, seeking No-Fault Benefits for Non-Fee Schedule items at rates that were grossly above the permissible reimbursement amount for Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits that they could receive.

83.     After obtaining the vague and generic prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers as a result of paying various forms of consideration, the Defendants would bill GEICO for: (i) Fraudulent Equipment that were not reasonable or medically necessary; (ii) Fraudulent Equipment that were not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that was never provided to Insureds; (iv) Fee Schedule items that did not represent the HCPCS codes contained in the bills to GEICO; (v) Non-Fee Schedule items at grossly inflated reimbursement rates; and (vi) Fraudulent Equipment that were otherwise not reimbursable.

**B.     Defendants Failure to Comply with Local Licensing Provisions**

84.     As stated above, for a DME/OD supplier to provide DME or OD to automobile accident victims within the City of New York, the DME/OD supplier must receive a Dealer in Products License by the DCA.

85.     An overwhelming majority of the Insureds identified in Exhibit "1" were located within the City of New York.

86.     For the Defendants to lawfully provide DME/OD to the Insureds identified in Exhibit "1", Med Supply was required to obtain a Dealer in Products License from the DCA.

87.     As part of the Defendants scheme to defraud GEICO and other Insurers, the Defendants sought a Dealer in Products License from the DCA in order to appear to legitimately operate a DME/OD supplier.

88.     As part of obtaining a Dealer in Products License, the Defendants completed a license application form that required Med Supply to identify – among other things – the commercial address of where Med Supply physically operated from.

89.     On May 19, 2019, Malinin, on behalf of Med Supply, applied for a Dealer in Products License, and signed the affirmation at the end of the application whereby Malinin affirmed that he is authorized to complete and submit the application on behalf of Med Supply and that the information contained in the application is true, correct, and complete.

90.     Malinin's affirmation for Med Supply's Dealer in Products License was signed under penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

91.     However, and in support of the fact that the Defendants schemed to defraud GEICO and other automobile insurers of No-Fault Benefits, Malinin knowingly provided false information in the application for Med Supply's Dealer in Products License.

92.     Specifically, Malinin falsely affirmed that Med Supply operated out of 101 Avenue U, Room 3, Brooklyn, New York 11223, knowing that Med Supply did not actually operate or conduct any business from that address.

93.     Malinin falsely identified Med Supply's premises addresses as 101 Avenue U, Room 3, Brooklyn, New York 11223 to induce the DCA to issue to him a Dealer in Products License, which would give the Defendants the appearance of legitimacy and provide the Defendants with the opportunity to submit fraudulent billing to GEICO and other insurers through Med Supply.

94.     In support of the fact that Med Supply never operated out of 101 Avenue U, Room 3 and that Malinin falsely identified 101 Avenue U, Room 3 as Med Supply's operating address in the application for a Dealer in Products License, 101 Avenue U, Brooklyn, New York does not contain a "Room 3".

95.     During its investigation into the Defendants, GEICO investigators conducted a physical inspection of 101 Avenue U and observed that there was no suite or office space entitled "Room 3".

96.     Instead, 101 Avenue U is a two-story building that was occupied by one tenant on each floor, neither of which was Med Supply.

97.     Additionally, the signage identifying the tenants of 101 Avenue U did not identify Med Supply or reference a "Room 3".

98.     In fact, Med Supply never operated out of 101 Avenue U, Room 3, Brooklyn, New York – as referenced in Med Supply's application for a Dealer in Products License – or at any other part of 101 Avenue U.

99.     The Defendants falsely identified 101 Avenue U, Room 3, Brooklyn, New York 11223 as Med Supply's business address in the application for a Dealer in Products License to obtain a Dealer in Products License.

100.     In keeping with the fact that the Defendants purposefully identified a false and non-existent commercial space – 101 Avenue U, Room 3 – as Med Supply's premises address, the Defendants included the same false address as their operating address on the "Assignment of Benefits" forms submitted to GEICO for virtually every Insured identified in Exhibit "1".

101.     By falsifying the Med Supply's business address in the application for a Dealer in Products License and affirming that the information in the application, including the business address, was truthful and accurate, Med Supply's Dealer in Products License was obtained through false pretenses.

102.     As such, Med Supply never properly obtained a Dealer in Products License, and was therefore, not lawfully permitted to sell, rent, fit, or adjust any DME/OD for Insureds within the City of New York.

103.     As a result, the Defendants were never entitled to receive No-Fault Benefits because they failed to comply with all significant statutory and regulatory requirements by operating as a DME/OD supplier within the City of New York without a valid Dealer in Products License.

104.     In each of the claims identified in Exhibit "1", the Defendants fraudulently misrepresented that they were properly licensed with all local statutory and regulatory requirements and were lawfully permitted to provide DME/OD to Insureds when the Defendants were never eligible to collect No-Fault Benefits in the first instance because they Med Supply did not lawfully obtain a Dealer in Products License.

C.     **The Defendants' Illegal Financial Arrangements**

105.     Upon information and belief, in order to obtain access to Insureds so the Defendants could implement and execute their fraudulent schemes and maximize the amount of No-Fault Benefits the Defendants could obtain from GEICO and other New York automobile insurers, the

Defendants entered into illegal agreements with others who are not presently identifiable where prescriptions for Fraudulent Equipment were provided to the Defendants in exchange for financial consideration.

106.    Upon information and belief, since Med Supply's inception the Defendants engaged in unlawful financial arrangements with others who are not presently identifiable in order to obtain prescriptions for Fraudulent Equipment. These schemes allowed the Defendants to submit thousands of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

107.    Upon information and belief, pursuant to the unlawful financial arrangements, the Defendants would pay kickbacks to others who are not presently identifiable, including individuals and entities, such as fictitious businesses, to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers.

108.    In support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the Defendants and others who are not presently identifiable, the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to predetermined fraudulent protocols.

109.    As explained in more detail below, the Defendants received prescriptions purportedly issued by Referring Providers who worked at various Clinics, including the Sutphin Blvd and Ralph Ave. Clinics. The prescriptions for Fraudulent Equipment from each Referring Provider were not medically necessary as they contained a predetermined set of virtually identical Fraudulent Equipment.

110.    Upon information and belief, and in keeping with the fact that the Defendants obtained prescriptions for Fraudulent Equipment because of unlawful financial arrangements with

others who are not presently identifiable, the Defendants received fraudulent prescriptions from the Clinics that were never actually prescribed by the purported Referring Provider.

111.    Upon information and belief, many of the charges identified in Exhibit "1" are based upon prescriptions for Fraudulent Equipment that were never actually issued, signed, or otherwise authorized by the listed Referring Provider. Instead, the prescriptions for Fraudulent Equipment were created by others who are not presently known and were provided to the Defendants as part unlawful financial arrangements.

112.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements, upon information and belief Malinin never met the Referring Providers who purportedly issued prescriptions that were used by the Defendants to bill GEICO.  Instead, the prescriptions for the Fraudulent Equipment were procured by Malinin as a result of arrangements with others who are not presently identifiable.

113.    In keeping with the fact that the Defendants obtained prescriptions for Fraudulent Equipment as a result of unlawful financial arrangements, the Defendants (i) received virtually identical predetermined sets of prescriptions from multiple Referring Providers operating out of the same Clinic; (ii) received prescriptions for Fraudulent Equipment that were never actually signed by the Referring Providers; and (iii) obtained prescriptions for Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds.

114.    In keeping with the fact that, because of unlawful financial arrangements, the Defendants obtained prescriptions for Fraudulent Equipment purportedly issued by but never actually signed by the Referring Providers, many of the claims identified in Exhibit "1" were based upon prescriptions for Fraudulent Equipment that were signed by the use of a signature stamp containing Zakaria's signature.

115.    In also keeping with the fact that, as the result of unlawful financial arrangements, the Defendants obtained prescriptions for Fraudulent Equipment purportedly issued by but never actually signed by the Referring Providers, many of the claims identified in Exhibit "1" were based upon prescriptions for Fraudulent Equipment that contained photocopied signatures by Elton, Zakaria, Caruso, and Igbokwe.

116.    In keeping with the fact Med Supply obtained the prescriptions for Fraudulent Equipment directly from the Clinics and without any involvement by Insureds, and in some instances without any involvement by the Referring Provider, the prescriptions purportedly issued by the Referring Providers were provided directly to the Defendants from the Clinics' receptionists.

117.    Furthermore, and to the extent that the Insureds received any Fraudulent Equipment, in many cases, the Insureds were provided with Fraudulent Equipment directly from the Clinics without any interaction with the Defendants.

118.    In further support that the Fraudulent Equipment was provided without any interaction by the Defendants, statements provided to GEICO by Insureds confirmed that when Insureds were actually provided with Fraudulent Equipment, they received it directly from one of the Clinics, typically from the receptionists, without any involvement from the Defendants, and never received prescriptions for Fraudulent Equipment from a healthcare provider.

119.    For example:

(i)     On May 23, 2019, an Insured named PP was purportedly injured in a motor vehicle accident. Thereafter, PP received treatment at a multi-disciplinary medical office located at 227A E 105th Street, New York, New York ("105th Street Clinic"). During an interview with a GEICO investigator, PP confirmed that: (i) PP received Fraudulent Equipment from the receptionist at the 105th Street Clinic; (ii) no one measured PP prior to dispensing the Fraudulent Equipment; and (iii) no one instructed PP on how to use the Fraudulent Equipment.

(ii)     On May 31, 2019, an Insured named YR was purportedly injured in a motor vehicle accident. Thereafter, YR received treatment at a multi-disciplinary medical office located at 79-45 Metropolitan Ave., Flushing, New York ("Metropolitan Ave Clinic"). During an interview with a GEICO investigator, YR confirmed that: (i) YR received Fraudulent Equipment from a receptionist at the Metropolitan Ave Clinic; and (ii) no one instructed YR on how to use the Fraudulent Equipment.

(iii)    On June 10, 2019, an Insured named RD was purportedly injured in a motor vehicle accident. Thereafter, Ronni Dailey received treatment at the Sutphin Blvd. Clinic. During an interview with a GEICO investigator, RD confirmed that RD received Fraudulent Equipment directly from the receptionist working at the Sutphin Blvd. Clinic.

(iv)     On July 16, 2019, an Insured named CT was purportedly injured in a motor vehicle accident. Thereafter, CT received treatment at the Metropolitan Ave Clinic. During an interview with a GEICO investigator, Chitrainie Toledo confirmed that: (i) CT received Fraudulent Equipment from a receptionist at the Metropolitan Ave Clinic; (ii) no one measured CT prior to dispensing the Fraudulent Equipment; and (iii) no one instructed CT on how to use the Fraudulent Equipment.

(v)      On September 5, 2019, an Insured named MF was purportedly injured in a motor vehicle accident. Thereafter, MF received treatment at a multi-disciplinary medical office located at 1984 Eastchester Road, Bronx, NY (the "Eastchester Rd Clinic"). During an interview with a GEICO investigator, MF confirmed that: (i) MF received Fraudulent Equipment directly from a receptionist at the Eastchester Rd Clinic; and (ii) no one measured MF prior to dispending the Fraudulent Equipment.

(vi)     On September 6, 2019, an Insured named FR was purportedly injured in a motor vehicle accident. Thereafter, FR received treatment at the Sutphin Blvd. Clinic. During an interview with a GEICO investigator, FR confirmed that: (i) FR received Fraudulent Equipment directly from non-medical personnel working at the Sutphin Blvd. Clinic; and (ii) no one instructed FR on how to use the Fraudulent Equipment.

(vii)    On September 22, 2019, an Insured named AA was purportedly injured in a motor vehicle accident. Thereafter, AA received treatment at a multi-disciplinary medical office located at 1767 Southern Blvd., Bronx, New York (the "Southern Blvd Clinic"). During an interview with a GEICO investigator, AA confirmed that AA received Fraudulent Equipment from non-medical personnel at the Southern Blvd Clinic.

(viii)   On October 10, 2019, an Insured named KL was purportedly injured in a motor vehicle accident. Thereafter, KL received treatment at the Eastchester Rd Clinic. During an interview with a GEICO investigator, Kerry Lambert

confirmed that: (i) KL received Fraudulent Equipment directly from a receptionist at the Eastchester Rd Clinic; and (ii) no one measured KL prior to dispending the Fraudulent Equipment.

(ix)    On November 9, 2019, an Insured named HT was purportedly injured in a motor vehicle accident. Thereafter, HT received treatment at a multi-disciplinary medical office located at 55 E 115th Street, New York, New York (the "115th St. Clinic"). During an interview with a GEICO investigator, HT confirmed that: (i) HT received Fraudulent Equipment directly from the receptionist at the 115th St. Clinic; and (ii) no one measured HT prior to dispending the Fraudulent Equipment.

(x)    On November 27, 2019, an Insured named RM was purportedly injured in a motor vehicle accident. Thereafter, RM received treatment at the 115th St. Clinic. During an interview with a GEICO investigator, RM confirmed that: (i) RM received Fraudulent Equipment directly from the receptionist at the 115th St. Clinic; and (ii) no one measured RM prior to dispending the Fraudulent Equipment.

120.    These are only representative examples. In virtually all the claims for Fraudulent Equipment identified in Exhibit "1", as part of the Defendants unlawful financial arrangements with others who are presently unidentifiable, the Insureds received the Fraudulent Equipment directly from the Clinics without any involvement by the Defendants, to the extent that the Insureds were actually provided with any Fraudulent Equipment.

121.    In all the claims identified in Exhibit "1", the Defendants falsely represented that Fraudulent Equipment were provided pursuant to lawful prescriptions from healthcare providers, and where therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

**D.    The Prescriptions Obtained Pursuant to Predetermined Fraudulent Protocols**

122.    In addition to the Defendants' unlawful financial arrangements, pursuant to agreements with others who are not presently identifiable, the Defendants obtained prescriptions for Fraudulent Equipment purportedly issued by pursuant to predetermined fraudulent protocols,

which were designed to maximize the billing that the Defendants – and others – could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

123.    In the claims identified in Exhibit "1", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

124.    Concomitantly, almost none of the Insureds identified in Exhibit "1", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

125.    In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidently, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

126.    To the extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

127.    However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who treated with each of the Referring Providers were subject to extremely similar treatment including nearly identical prescriptions for Fraudulent Equipment.

128.    The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibit "1" were issued pursuant to predetermined fraudulent protocols set

forth at each Clinic, not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

129.   No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

130.   In general, the Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers pursuant to the following predetermined fraudulent protocols:

- an Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident;

- the Insured would be seen either by a Referring Provider;

- on the date of the first visit, the Referring Provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a set of DME and/or OD;

- subsequently, the Insured would return to the Clinic for one or more additional evaluations and treatment by other healthcare providers, and would be provided with at least one additional prescription for a predetermined set of DME and/or OD, although the Referring Provider did not always treat the Insured on the date of the additional prescription for DME and/or OD; and

- at least one, if not more than one, prescription for DME and/or OD would be directly provided to the Defendants to fill and was without any involvement by the Insured.

131.   Virtually all of the claims identified in Exhibit "1" are based upon medically unnecessary prescriptions for predetermined sets of Fraudulent Equipment, which were purportedly issued by the Referring Providers who practiced at various Clinics across the New York metropolitan area.

132.   In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the

treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

133.    Furthermore, in a legitimate setting, during a patient's course of treatment, a healthcare provider <u>may</u> – but not always – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.

134.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

135.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

136.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in an automobile accident.

137.    If a healthcare provider determines that DME and/or OD is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed and why.

138.    It is improbable – to the point of impossibility – that virtually all the Insureds identified in Exhibit "1" who treated with a specific Referring Provider would receive virtually

identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

139.    It is even more improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibit "1" who treated with different Referring Providers at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

140.    Here, and in keeping with the fact that the prescriptions provided to the Defendants were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibit "1" that treated at a specific Clinic were issued virtually identical prescriptions for a predetermined set of Fraudulent Equipment.

141.    In keeping with the fact that the prescriptions for Fraudulent Equipment used by the Defendants to support the charges identified in Exhibit "1" were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, many of the prescriptions were purportedly issued on dates that the Insureds never treated with the Referring Providers.

142.    Also, in keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were issued pursuant to predetermined fraudulent protocols, and not for the benefit of the Insureds – as set forth below – the Referring Providers all issued similar checkmark-based prescriptions and routinely issued multiple checkmark-based prescriptions to a single patient on the same day when there was no legitimate reason to do so.

143.     In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to predetermined fraudulent protocols, to the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill GEICO for the charges identified in Exhibit "1".

144.     In further keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibit "1" were not medical necessity but were the result of predetermined fraudulent protocols, the prescriptions typically contained vague and generic descriptions for DME and OD, which – as explained in more detail below – provided the Defendants with the opportunity to purportedly provide – and bill GEICO for – whatever DME or OD they wanted.

145.     Even more, and as also explained below in more detail, the charges to GEICO identified in Exhibit "1" were not based upon prescriptions for medically necessary Fraudulent Equipment because the Defendants purportedly provided Insureds with whatever DME or OD that they wanted, even when the Fraudulent Equipment purportedly provided – and billed to GEICO – was not the item identified in the prescriptions purportedly issued by the Referring Providers.

146.     In further keeping with the fact that the Defendants obtained prescriptions for Fraudulent Equipment as a result of predetermined fraudulent protocols – and not based upon medical necessity – the specific Fraudulent Equipment contained in the prescriptions usually contravened the Insureds' conservative treatment plans.

147.     For example, virtually every Insured identified in Exhibit "1" was provided with at least one prescription for Fraudulent Equipment that called for immobilizing devices, such as a

lumbosacral brace (sometimes referred to as "lumbar sacral support" or "LSO") or a cervical collar. By contrast, the Insureds were also prescribed physical therapy treatments which called for the bending and stretching to strengthen weakened parts of the body.

148.   The prescribed immobilizing devices completely contravene the mobilizing physical therapy treatments that the Insureds were also prescribed. In the context of treatment for injuries related to minor and low-impact motor vehicle accidents, no legitimate physician, chiropractor, or other licensed healthcare provider acting in each patient's best interest would prescribe both mobilizing physical therapy and immobilizing devices at the same time.

149.   Upon information and belief, and in further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were issued because of predetermined fraudulent protocols and not based upon medical necessity, many of the prescriptions identified in Exhibit "1" were not actually issued by the Referring Provider listed on the prescription. Instead, the prescriptions were issued by others who are not presently identifiable, without the Referring Providers issuing, signing, authorizing, or even knowing about such prescriptions.

150.   Upon information and belief, and in further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were issued because of predetermined fraudulent protocols and not based upon medical necessity the prescriptions purportedly issued by the Referring Providers were never given to the Insureds.

151.   Instead, upon information and belief, the Insureds were provided with Fraudulent Equipment directly from the Clinic's receptionists or delivered directly to Insureds' homes, without any interaction from the Defendants – to the extent that the Insureds actually received any Fraudulent Equipment.

152.     For the reasons set forth above, and below, in each of the claims identified  in Exhibits "1", the Defendants falsely represented that Fraudulent Equipment were provided pursuant to prescriptions from healthcare providers for medically necessary DME or OD, and where therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the Defendants pursuant agreements with others who are not presently identifiable.

### 1)     The Predetermined Fraudulent Protocol at the Sutphin Blvd. Clinic

153.     The Sutphin Blvd. Clinic was one of the Clinics that the Defendants conspired with others who are not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment issued pursuant to predetermined fraudulent protocols.

154.     After their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds identified in Exhibit "1" who purportedly received treatment at the Sutphin Blvd. Clinic were purportedly provided with initial examinations from a healthcare provider. After their purported initial examinations, each of the Insureds were prescribed multiple items of Fraudulent Equipment.

155.     When the Insureds sought treatment with and were purportedly provided with an initial evaluation by Referring Providers at the Sutphin Blvd. Clinic, they did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

156.     Rather, Referring Providers at the Sutphin Blvd. Clinic or others at the Sutphin Blvd. Clinic presently unknown to GEICO, purportedly issued prescriptions for a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon a predetermined fraudulent protocol.

157.    In keeping with the fact that the prescriptions purportedly issued by Referring Providers at the Sutphin Blvd. Clinic after purported initial examinations were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, virtually every Insured who underwent an initial examination at the Sutphin Blvd. Clinic received a prescription for virtually the same type of Fraudulent Equipment.

158.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination at the Sutphin Blvd. Clinic, Referring Providers virtually always purportedly prescribed the following Fraudulent Equipment to every Insured identified in Exhibit "1" that they treated: (i) a cervical collar; (ii) a cervical pillow; (iii) a lumbar sacral orthosis; (iv) a heating pad; (v) a lumbar cushion; (vi) an orthopedic car seat; (vii) an eggcrate mattress; and (viii) a bed board.

159.    To the extent that the Insureds identified in Exhibit "1" returned to the Sutphin Blvd. Clinic and purportedly underwent follow-up examinations or treatments, the Insureds would virtually always be provided with at least one or more additional prescriptions for a predetermined set of Fraudulent Equipment purportedly issued by the Referring Providers.

160.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, Referring Providers virtually always purportedly prescribed the following Fraudulent Equipment to every Insured identified in Exhibit "1" that continued treating at the Sutphin Blvd. Clinic: (i) a TENS unit; (ii) a massager (iii) an infrared heating lamp; and (iv) a hydrotherapy whirlpool.

161.    In addition to the items prescribed to virtually every Insured after a purported follow-up examination, Referring Providers at the Sutphin Blvd. Clinic purportedly provided separate additional prescriptions for Fraudulent Equipment that virtually always included at least one of following: (i) a custom fitted lumbar orthotic; (ii) cervical traction equipment; (iii) a custom-fitted shoulder or knee support; and/or (iv) a 28-day rental of a "Thermotek Vascutherm Hot/Cold Contrast Compression Therapy". Prescriptions for these items were often provided to other DME/OD suppliers.

162.    In further keeping with the fact that the prescriptions for medically unnecessary Fraudulent Equipment purportedly issued to Insureds by the Referring Providers pursuant to a predetermined fraudulent protocol, virtually every Insured who treated at the Sutphin Blvd. Clinic was issued at least one prescription for Fraudulent Equipment that was dated on a day that the Insureds was not examined or otherwise treated by the Referring Provider who purportedly issued the prescription.

163.    For example:

(i)     On May 6, 2019, an Insured named LT was purportedly involved in a motor vehicle accident. LT purportedly started treating at the Sutphin Blvd. Clinic on or around May 7, 2019. After Elton purportedly performed an initial examination on LT, Elton purportedly issued a prescription in the name of LT that was provided to the Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a LSO; (iv) a heating pad; (v) a lumbar cushion; (vi) an orthopedic car seat; (vii) a shoulder support; (viii) a wrist support; and (ix) a knee support. On May 28, 2019, Elton purportedly issued a second prescription in the name of LT for a "L3960 shoulder brace custom fitted– Lt" that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on LT on that day.  On June 5, 2019, Elton purportedly issued two separate prescriptions in the name of LT for: (i) "L3908 wrist support"; and (ii) "L1832 K.O. adjustable knee joint rigid  - Lt" that were provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on LT on that day. Also on June 5, 2019, Steinberg purportedly issued a prescription in the name of LT for a "E0855 cervical traction w/pump" that was provided to another DME/OD

supplier, despite Steinberg not performing a follow-up examination or any other service on LT on that day.  On June 11, 2019, following a purported follow-up examination with Elton, Elton purportedly issued the following prescription in the name of LT that was provided to the Defendants for: (i) a TENS unit; (ii) an infrared heating lamp; (iii) a massager; and (iv) a hydrotherapy whirlpool.

(ii)    On May 7, 2019, an Insured named DC was purportedly involved in a motor vehicle accident. DC purportedly started treating at the Sutphin Blvd. Clinic on or around May 8, 2019. After Elton purportedly performed an initial examination on DC, Elton purportedly issued a prescription in the name of DC that was provided to the Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a LSO; (iv) a heating pad; (v) a lumbar cushion; (vi) an eggcrate mattress; (vii) a shoulder support; and (viii) a knee support.  On May 17, 2019, Elton purportedly issued a prescription in the name of DC for a 28-day rental of a Thermotek Vascutherm compression therapy unit that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on DC on that day.  Then, on May 23, 2019, Elton purportedly issued a second prescription in the name of DC for another 28-day rental of a Thermotek Vascutherm compression therapy unit that was provided to a different DME/OD supplier, despite Elton not performing a follow-up examination or any other service on DC on that day, and after having just purportedly prescribing the same exact 28-day rental just six days earlier.  On June 5, 2019, following a purported visit with Steinberg, Steinberg purportedly issued a prescription in the name of DC for a "E0855 cervical traction w/pump" that was provided to another DME/OD supplier.  On June 6, 2019, following a purported follow-up examination with Elton, Elton purportedly issued the following prescription in the name of DC that was provided to the Defendants for: (i) a TENS unit; (ii) an infrared heating lamp; (iii) a massager; and (iv) a hydrotherapy whirlpool. On June 24, 2019, following a purported visit with Steinberg, Steinberg purportedly issued a prescription in the name of DC for a "L0637 LSO w/APL control fitted/adj" that was provided to another DME/OD supplier.

(iii)    On May 15, 2019, an Insured named MY was purportedly involved in a motor vehicle accident. MY purportedly started treating at the Sutphin Blvd. Clinic on or around May 21, 2019. After Elton purportedly performed an initial examination on MY, Elton purportedly issued a prescription in the name of MY that was provided to the Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a LSO; (iv) a heating pad; (v) a lumbar cushion; (vi) an orthopedic car seat; (vii) an eggcrate mattress; (viii) a bed board; and (ix) an ankle support. On June 6, 2019, Elton purportedly issued a prescription in the name of MY for a "L3960 shoulder brace custom fitted – Lt" that was provided to another

DME/OD supplier, despite Elton not performing a follow-up examination or any other service on MY on that day.  On June 17, 2019, Steinberg purportedly issued two separate prescriptions in the name of MY for: (i) "E0855 cervical traction w/pump"; and (ii) "L0637 LSO w/APL control fitted/adj" that were both provided to another DME/OD supplier, despite Steinberg not performing a follow-up examination or any other service on MY on that day.  On June 20, 2019, Elton purportedly issued the following prescription in the name of MY that was provided to the Defendants for: (i) a TENS unit; (ii) an infrared heating lamp; (iii) a massager; and (iv) a hydrotherapy whirlpool, despite Elton not performing a follow-up examination or any other service on MY on that day. On July 2, 2019, Elton purportedly issued a prescription in the name of MY for a 28-day rental of a Thermotek Vascutherm compression therapy unit that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on MY on that day.  On August 2, 2019, Elton purportedly issued a second prescription in the name of MY for a 28-day rental of a Thermotek Vascutherm compression therapy unit that was provided to a different DME/OD supplier, despite Elton not performing a follow-up examination or any other service on MY on that day.

(iv)     On June 10, 2019, an Insured named RD was purportedly involved in a motor vehicle accident. RD purportedly started treating at the Sutphin Blvd. Clinic on or around July 1, 2019. After Elton purportedly performed an initial examination on RD, Elton purportedly issued a prescription in the name of RD that was provided to the Defendants for the following Fraudulent Equipment: (i) a LSO; (ii) a heating pad; (iii) a lumbar cushion; (iv) an orthopedic car seat; (v) an egg crate mattress; and (vi) a bed board. On July 24, 2019, Elton purportedly issued a prescription in the name of RD for a 28-day rental of a Thermotek Vascutherm compression therapy unit that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on RD on that day. On July 26, 2019, Steinberg purportedly issued a prescription in the name of RD for a "L0637 LSO w/APL control fitted/adj" that was provided to another DME/OD supplier despite Steinberg not performing a follow-up examination or any other service on RD on that day.  On August 6, 2019, the same day that Elton purportedly conducted a follow-up examination, Elton purportedly issued the following prescription in the name of RD that was provided to the Defendants for: (i) a TENS unit; (ii) an infrared heating lamp; (iii) a massager; and (iv) a hydrotherapy whirlpool.  On November 4, 2019, Elton purportedly issued a prescription in the name of RD for a "L3674 shoulder orthosis - L" that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on RD on that day.

(v)     On July 26, 2019, an Insured named NR was purportedly involved in a motor vehicle accident. NR purportedly started treating at the Sutphin Blvd.

Clinic on or around July 30, 2019. After Elton purportedly performed an initial examination on NR, Elton purportedly issued a prescription in the name of NR that was provided to the Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a LSO; (iv) a heating pad; (v) a lumbar cushion; (vi) an orthopedic car seat; (vii) an eggcrate mattress; (viii) a bed board; and (ix) a shoulder support. On August 9, 2019, Elton purportedly issued a prescription in the name of NR for a "L3960 shoulder brace custom fitted – Lt" that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on NR on that day.  Also on August 9, 2019, Steinberg purportedly issued a prescription in the name of NR for a "E0855 cervical traction w/pump" that was provided to another DME/OD supplier, despite Steinberg not performing a follow-up examination or any other service on NR on that day. On August 22, 2019, Elton purportedly issued a prescription in the name of NR for a "L3960 shoulder brace custom fitted – Rt" that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on NR on that day.  On September 5, 2019, following a purported follow-up examination with Elton, Elton purportedly issued the following prescription in the name of NR that was provided to the Defendants for: (i) a TENS unit; (ii) an infrared heating lamp; (iii) a massager; and (iv) a hydrotherapy whirlpool.  On September 27, 2019, Elton purportedly issued a prescription in the name of NR for a 28-day rental of a Thermotek Vascutherm compression therapy unit that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on NR on that day.  On October 7, 2019, Steinberg purportedly issued a prescription in the name of NR for a "L0637 LSO w/APL control fitted/adj" that was provided to another DME/OD supplier, despite Steinberg not performing a follow-up examination or any other service on NR on that day.

(vi)     On August 29, 2019, an Insured named SK was purportedly involved in a motor vehicle accident. SK purportedly started treating at the Sutphin Blvd. Clinic on or around September 3, 2019. After Petronela Antohi, M.D. ("Antohi"), a Referring Provider at the Sutphin Blvd. Clinic, purportedly performed an initial examination on SK, Antohi purportedly issued a prescription in the name of SK that was provided to the Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a LSO; (iv) a heating pad; (v) a lumbar cushion; (vi) an orthopedic car seat; (vii) an egg crate mattress; (viii) a bed board; and (ix) a shoulder support. On September 11, 2019, Steinberg purportedly issued a prescription in the name of SK for a "L0637 LSO w/APL control fitted/adj" that was provided to another DME/OD supplier, despite Steinberg not performing a follow-up examination or any other service on SK on that day. On September 23, 2019, Elton purportedly issued two separate prescriptions in the name of SK for: (i) "3960 shoulder brace custom fitted – Rt"; and (ii)

"L1832 K.O. adjustable knee joint rigid – Rt" that were provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on SK on that day.  Also on September 23, 2019, following a purported visit with Steinberg, Steinberg purportedly issued a prescription in the name of SK for a "E0855 cervical traction w/pump" that was provided to another DME/OD supplier.  On September 25, 2019, Elton purportedly issued a prescription in the name of SK for a 28-day rental of a Thermotek Vascutherm compression therapy unit that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on SK on that day.  On October 3, 2019, the same day that Elton purportedly conducted a follow-up examination, Elton purportedly issued the following prescription in the name of SK that was provided to the Defendants for: (i) a TENS unit; (ii) an infrared heating lamp; (iii) a massager; and (iv) a hydrotherapy whirlpool.

(vii)     On October 3, 2019, an Insured named IJ was purportedly involved in a motor vehicle accident. IJ purportedly started treating at the Sutphin Blvd. Clinic on or around October 8, 2019. After Elton purportedly performed an initial examination on IJ, Elton purportedly issued a prescription in the name of IJ that was provided to the Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a LSO; (iv) a heating pad; (v) a lumbar cushion; (vi) an orthopedic car seat; (vii) an egg crate mattress; (viii) a bed board; (ix) a shoulder support; (x) a knee support; and (xi) an ankle support. On November 5, 2019, Steinberg purportedly issued two separate prescriptions in the name of IJ for: (i) "E0855 cervical traction w/pump"; and (ii) "L0637 LSO w/APL control fitted/adj" that were both provided to another DME/OD supplier, despite Steinberg not performing a follow-up examination or any other service on IJ on that day.  On November 6, 2019, Elton purportedly issued the following prescription in the name of IJ that was provided to the Defendants for: (i) a TENS unit; (ii) an infrared heating lamp; (iii) a massager; and (iv) a hydrotherapy whirlpool, despite Elton not performing a follow-up examination or any other service on IJ.  On November 14, 2019, Elton purportedly issued a prescription in the name of IJ for a 28-day rental of a Thermotek Vascutherm compression therapy unit that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on IJ on that day.  On November 15, 2019, Elton purportedly issued a prescription in the name of IJ for a "L3674 shoulder orthosis – R" that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on IJ on that day.  On December 19, 2019, Elton purportedly issued a prescription in the name of IJ for a "L1900 ankle support - L" that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on IJ on that day.

(viii)   On October 10, 2019, an Insured named SG was purportedly involved in a motor vehicle accident. SG purportedly started treating at the Sutphin Blvd. Clinic on or around October 29, 2019. After Elton purportedly performed an initial examination on SG, Elton purportedly issued a prescription in the name of SG that was provided to the Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a LSO; (iv) a heating pad; (v) a lumbar cushion; (vi) an orthopedic car seat; (vii) an egg crate mattress; (viii) a bed board; (ix) a shoulder support; and (x) a knee support. On November 26, 2019, Elton purportedly issued a prescription in the name of SG for a 28-day rental of a Thermotek Vascutherm compression therapy unit that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on SG on that day. On December 12, 2019, Steinberg purportedly issued a prescription in the name of SG for a "E0855 cervical traction w/pump" that was provided to another DME/OD supplier, despite Steinberg not performing a follow-up examination or any other service on SG on that day.  On December 26, 2019, following a purported follow-up examination with Elton, Elton purportedly issued the following prescription in the name of SG that was provided to the Defendants for: (i) a TENS unit; (ii) an infrared heating lamp; (iii) a massager; and (iv) a hydrotherapy whirlpool.

(ix)   On November 8, 2019, an Insured named AB was purportedly involved in a motor vehicle accident. AB purportedly started treating at the Sutphin Blvd. Clinic on or around November 12, 2019. After Elton purportedly performed an initial examination on AB, Elton purportedly issued a prescription in the name of AB that was provided to the Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a LSO; (iv) a heating pad; (v) a lumbar cushion; (vi) an orthopedic car seat; (vii) an egg crate mattress; (viii) a bed board; and (ix) a shoulder support. On November 25, 2019, following a purported visit with Steinberg, Steinberg purportedly issued a prescription in the name of AB for a "L0637 LSO w/APL control fitted/adj" that was provided to another DME/OD supplier.  Also on November 25, 2019, Elton purportedly issued a prescription in the name of AB for a "L3674 shoulder orthosis - R" that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on AB on that day.   On December 12, 2019, Steinberg purportedly issued a prescription in the name of AB for a "E0855 cervical traction w/pump" that was provided to another DME/OD supplier, despite Steinberg not performing a follow-up examination or any other service on AB on that day. On December 13, 2019, Elton purportedly issued a prescription in the name of AB for a 28-day rental of a Thermotek Vascutherm compression therapy unit that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on AB on that day.   On December 18, 2019, following a purported follow-up examination with

Elton, Elton purportedly issued the following prescription in the name of AB that was provided to the Defendants for: (i) a TENS unit; (ii) an infrared heating lamp; (iii) a massager; and (iv) a hydrotherapy whirlpool.

(x)     On December 17, 2019, an Insured named TA was purportedly involved in a motor vehicle accident. TA purportedly started treating at the Sutphin Blvd. Clinic on or around December 24, 2019. After Elton purportedly performed an initial examination on TA, Elton purportedly issued a prescription in the name of DD, Jr. that was provided to the Defendants for the following Fraudulent Equipment: (i) a two-piece cervical collar; (ii) a cervical pillow; (iii) a LSO; (iv) a heating pad; (v) a lumbar cushion; (vi) an orthopedic car seat; (vii) an egg crate mattress; and (viii) a bed board. On January 14, 2020, Elton purportedly issued a prescription in the name of TA for a 28-day rental of a Thermotek Vascutherm compression therapy unit that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on TA on that day. On February 3, 2020, Elton purportedly issued a prescription in the name of TA for a "E0855 cervical traction with pump" that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on TA on that day.  On February 18, 2020, the same day that Elton purportedly conducted a follow-up examination, Elton purportedly issued the following prescription in the name of TA that was provided to the Defendants for: (i) a TENS unit; (ii) an infrared heating lamp; (iii) a massager; and (iv) a hydrotherapy whirlpool.  On February 24, 2020, Elton purportedly issued a prescription in the name of TA for a "L0637 lumbar sacral orthosis" that was provided to another DME/OD supplier, despite Elton not performing a follow-up examination or any other service on TA on that day.

164.    These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" that received treatment at the Sutphin Blvd. Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol established at the Sutphin Blvd. Clinic.

165.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the Sutphin Blvd. Clinic were medically unnecessary and issued pursuant to a predetermined fraudulent protocol, an overwhelming majority of the Insureds who treated at the Sutphin Blvd. Clinic received multiple prescriptions for virtually the same type of Fraudulent

Equipment, similar to the examples above, despite the fact that they were involved in relatively minor and low-impact motor vehicle accidents.

166.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the Sutphin Blvd. Clinic were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, the contemporaneous dated medical records, such as an initial examination report or a follow-up examination report, virtually never identified all of the Fraudulent Equipment purportedly prescribed to the Insureds and used by the Defendants to submit the charges identified in Exhibit "1".

167.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the Sutphin Blvd. Clinic were not medically necessary and issued pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports did not contain any sufficient information to explain why any of the Fraudulent Equipment was prescribed.

168.    For example, the preprinted template-based and fill-in the blank evaluation reports utilized by Elton at the Sutphin Blvd. Clinic contained a section for "Medical Supplies" and "Supplies Prescribed" with itemized DME/OD that are to be checked if prescribed.

169.    However, virtually none of the examination reports purportedly written on the same date as the prescription for Fraudulent Equipment contained any checkmark, circle, or other indication that DME/OD was to be prescribed to the Insureds.

170.    To the extent that the contemporaneous reports issued by Referring Providers at the Sutphin Blvd. Clinic did reference any of the Fraudulent Equipment prescribed, the evaluation reports virtually never contained any specific detail explaining why the Fraudulent Equipment was prescribed to the Insured.

171.    Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the Sutphin Blvd. Clinic were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, to the extent that prescriptions for Fraudulent Equipment were contemporaneously dated with follow-up examinations, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of previously prescribed Fraudulent Equipment.

172.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

173.    However, the follow-up examination reports from Referring Providers at the Sutphin Blvd. Clinic failed to include any meaningful information regarding the Fraudulent Equipment prescribed to the Insureds on a prior date.

174.    In further keeping with the fact that each prescription for Fraudulent Equipment purportedly issued by Referring Providers at the Sutphin Blvd. Clinic were not medically necessary and was part of the fraudulent scheme, virtually all of the prescriptions for cervical collars and lumbar sacrum orthoses routinely contravened the Insureds' conservative treatment plans.  For example, Elton systemically prescribed cervical collars and lumbar support braces which immobilize the patient while directing the Insureds to undergo physical therapy regimens, which would require prolonged bending and stretching of weakened parts of the body, including

the spine. In this context, the prescriptions for cervical collars and lumbar support braces completely contravened the mobilizing physical therapy treatments also prescribed by Elton. No legitimate treatment regimen would involve the simultaneous prescription of mobilizing physical therapy and immobilizing devices.

175.    Additionally, as part of the fraudulent scheme, the prescriptions purportedly issued by Referring Providers at the Sutphin Blvd. Clinic were never given to the Insureds but were routed directly to the Defendants and other DME/OD suppliers, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Sutphin Blvd. Clinic, without any interaction with or instruction concerning their use from the Defendants, other DME/OD suppliers, or a healthcare provider.

176.    Also as part of the fraudulent scheme, the prescriptions purportedly issued by the Referring Providers at the Sutphin Blvd. Clinic were purposefully generic and vague, which allowed the Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

177.    By way of example, rather than specifying the type of lumbar sacrum orthosis or cervical collar that patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code – the Referring Providers at the Sutphin Blvd. Clinic purportedly issued prescriptions containing the phrase "LSO/LS Support", "cervical collar (2pc)", and "knee support" that enabled the Defendants to select a specific type of lumbar brace, cervical collar, or knee brace that was more highly priced and

profitable, instead of issuing prescriptions for lumbar braces, cervical collars, and knee braces that were actually needed in the first instance, to the extent they were actually needed.

### 2) The Predetermined Fraudulent Protocol at the Ralph Ave. Clinic

178.    In addition to the Sutphin Blvd. Clinic, the Defendants conspired with others who are not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment issued pursuant to predetermined fraudulent protocols at the Ralph Ave. Clinic.

179.    After their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds identified in Exhibit "1" who purportedly received treatment at the Ralph Ave. Clinic were purportedly provided with initial examinations by from a healthcare provider. After their purported initial examinations, each of the Insureds were prescribed multiple items of Fraudulent Equipment.

180.    When the Insureds sought treatment with and were purportedly provided with an initial evaluation by Referring Providers at the Ralph Ave. Clinic, they did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

181.    Rather, Referring Providers or others at the Ralph Ave. Clinic presently unknown to GEICO purportedly issued prescriptions for a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon a predetermined fraudulent protocol.

182.    In keeping with the fact that the prescriptions purportedly issued by the Referring Providers at the Ralph Ave. Clinic after purported initial examinations were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, virtually every Insured who underwent an initial examination was issued a prescription for virtually the same type

of Fraudulent Equipment, regardless of which Referring Provider purportedly issued the prescription.

183.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination at the Ralph Ave. Clinic, Referring Provider virtually always prescribed the following Fraudulent Equipment to every Insured identified in Exhibit "1" that they treated: (i) a general use cushion (wide); (ii) a lumbar sacral support; (iii) a cervical collar; (iv) an eggcrate mattress; (v) a bed board; and (vi) a cervical pillow.

184.    In addition to the six items described above, Referring Providers at the Ralph Ave. Clinic would regularly prescribe: (i) an orthopedic car seat; (ii) a thermal moist heating pad; and (iii) a water heat pump.

185.    To the extent that the Insureds identified in Exhibit "1" returned to the Ralph Ave. Clinic and purportedly underwent follow-up examinations or treatment, the Insureds would frequently be provided at least one, and oftentimes three or more additional prescriptions for virtually identical Fraudulent Equipment purportedly issued by the Referring Providers and then provided to the Defendants or other DME/OD suppliers.

186.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, each patient's recovery since the accident, or whether each patient would actually use the Fraudulent Equipment, Referring Providers virtually always purportedly prescribed the following Fraudulent Equipment to every Insured identified in Exhibit "1" that continued treating at the Ralph Ave. Clinic: (i) a TENS unit; (ii) a TENS belt; (iii) a massager; and (iv) an infrared heating lamp.

187.    Along with the Fraudulent Equipment described above, Referring Providers at the Ralph Ave. Clinic would also frequently prescribe a whirlpool.

188.    In addition to Fraudulent Equipment described above, Referring Providers at the Ralph Ave. Clinic purportedly issued separate additional prescriptions for Fraudulent Equipment that virtually always included at least one of following: (i) a custom fitted lumbar orthotic; (ii) cervical posture pump; and/or (iii) a shoulder or knee support.  Prescriptions for these items were often provided to other DME/OD suppliers.

189.    In further keeping with the fact that the prescriptions for medically unnecessary Fraudulent Equipment purportedly issued to Insureds by the Referring Providers pursuant to a predetermined fraudulent protocol, virtually every Insured who treated at the Sutphin Blvd. Clinic was issued at least one prescription for Fraudulent Equipment that was dated on a day that the Insureds was not examined or otherwise treated by the Referring Provider who purportedly issued the prescription.

190.    For example:

(i)     On July 21, 2019, an Insured named VW was purportedly involved in a motor vehicle accident. VW purportedly started treating at the Ralph Ave. Clinic on or around July 23, 2019. After Igbokwe purportedly performed an initial examination VW, Igbokwe purportedly issued prescription in the name of VW that was provided to the Defendants that included the following Fraudulent Equipment: (i) a general use cushion (wide); (ii) a lumbar sacral support; (iii) a bed board; (iv) an eggcrate mattress; (v) a cervical collar; (vi) a cervical pillow; (vii) an orthopedic car seat; (viii) a water heat pump; (ix) a heating pad; and (x) an arm sling. On July 30, 2019, Igbokwe purportedly issued a prescription in the name of VW that was provided to the Defendants for a "shoulder orthosis – L", despite Igbokwe not performing a follow-up examination or any other service on VW on that day.  On August 20, 2019, Igbokwe purportedly issued two prescriptions in the name of VW that were both provided to the Defendants, despite Igbokwe not performing a follow-up examination or any other service on VW on that day.  The first prescription provided to the Defendants was for: (i) an infrared lamp; (ii) a massager; (iii) a TENS unit; (iv) a TENS belt;

and (v) a whirlpool.  The second prescription provided to the Defendants was for: (i) "cervical traction"; and (ii) "LSO w/APL control custom".

(ii)     On July 27, 2019, an Insured named LG was purportedly involved in a motor vehicle accident. LG purportedly started treating at the Ralph Ave. Clinic on or around July 30, 2019. After a Referring Provider named M. Cristin Perdue, M.D. ("Purdue") purportedly performed an initial examination on LG, Perdue purportedly issued an unsigned prescription in the name of LG that was provided to the Defendants that included the following Fraudulent Equipment: (i) a general use cushion (wide); (ii) a lumbar sacral support; (iii) a heating pad; (iv) an orthopedic car seat; and (v) a water heat pump.  On August 20, 2019, Igbokwe purportedly issued a prescription in the name of LG that was provided to the Defendants for a LSO w/APL control custom, despite Igbokwe not performing a follow-up examination or any other service on LG on that day.  On September 3, 2019, Igbokwe purportedly issued a prescription in the name of LG that was provided to the Defendants for: (i) an infrared lamp; (ii) a massager; (iii) a TENS unit; (iv) a TENS belt; and (v) a whirlpool, despite Igbokwe not performing a follow-up examination or any other service on LG on that day. On September 24, 2019, Igbokwe purportedly issued a prescription in the name of LG for a shoulder orthosis - L that was provided to the Defendants, despite Igbokwe not performing a follow-up examination or any other service on LG on that day.

(iii)    On August 28, 2019, an Insured named JS was purportedly involved in a motor vehicle accident. JS purportedly started treating at the Ralph Ave. Clinic on or around September 3, 2019. After Igbokwe purportedly performed an initial examination on JS, Igbokwe purportedly issued a prescription in the name of JS that was provided to the Defendants that included the following Fraudulent Equipment: (i) a general use cushion (wide); (ii) a lumbar sacral support; (iii) a bed board; (iv) an eggcrate mattress; (v) a cervical collar; (vi) a cervical pillow; (vii) an orthopedic car seat; (viii) a water heat pump; (ix) a heating pad; and (x) a knee brace.  On September 17, 2019, a Referring Provider named Alford Smith, M.D. ("Smith") purportedly issued a prescription from the Ralph Ave. Clinic in the name of JS that was provided to another DME/OD supplier for a "K.O. (custom fitted)", despite Smith not performing a follow-up examination or any other service on JS on that day. On October 1, 2019, Raia purportedly issued a prescription from the Ralph Ave. Clinic in the name of JS that was provided to another DME/OD supplier for a cervical posture pump, despite Raia not performing a follow-up examination or any other service on JS on that day.  On October 7, 2019, the same day that Zakaria purportedly conducted an examination of JS at the Ralph Ave. Clinic, Zakaria purportedly issued the following prescription in the name JS that was provided to the Defendants: (i) an infrared lamp; (ii) a massager; (iii) a TENS unit; (iv) a TENS belt; and (v) a whirlpool.  On October 10, 2019,

Zakaria purportedly issued a prescription in the name of Jeffrey Shephard for the following Fraudulent Equipment: (i)"cervical traction"; (ii) "K.O. (custom fitted); and (iii) "LSO w/APL control custom", that was provided to the Defendants despite Zakaria not performing a follow-up examination or any other service on JS on that day.

(iv)     On September 9, 2019, an Insured named AF was purportedly involved in a motor vehicle accident. AF purportedly started treating at the Ralph Ave. Clinic on or around September 10, 2019. After Igbokwe purportedly performed an initial examination on AF, Igbokwe purportedly issued a prescription in the name of AF that was provided to the Defendants that included the following Fraudulent Equipment: (i) a general use cushion (wide); (ii) a lumbar sacral support; (iii) a bed board; (iv) an eggcrate mattress; (v) a cervical collar; (vi) a cervical pillow; (vii) an orthopedic car seat; (viii) a water heat pump; (ix) a heating pad; and (x) an arm sling.  On September 21, 2019, Igbokwe purportedly issued a prescription in the name of AF that was provided to another DME/OD supplier for a cervical posture pump, despite Igbokwe not performing a follow-up examination or any other service on AF on that day. On October 1, 2019, Raia purportedly issued a prescription in the name of AF that was provided to the Defendants for: (i) a TENS unit; (ii) "cervical traction"; (iii) "LSO w/APL control custom"; and (iv) a shoulder orthosis, despite Raia not performing a follow-up examination or any other service on AF on that day.  On October 7, 2019, Zakaria purportedly issued the following prescription in the name AF that was provided to the Defendants: (i) an infrared lamp; (ii) a massager; (iii) a TENS unit; (iv) a TENS belt; and (v) a whirlpool, despite Zakaria not performing a follow-up examination or any other service on AF on that day.

(v)      On September 20, 2019, an Insured named JW was purportedly involved in a motor vehicle accident. JW purportedly started treating at the Ralph Ave. Clinic on or around October 7, 2019. After Zakaria purportedly performed an initial examination on JW, Zakaria purportedly issued a prescription in the name of JW that was provided to the Defendants that included the following Fraudulent Equipment: (i) a general use cushion (wide); (ii) a lumbar sacral support; (iii) a bed board; (iv) an eggcrate mattress; (v) a cervical collar; (vi) a cervical pillow; (vii) an orthopedic car seat; (viii) a water heat pump; and (ix) a knee brace.  On October 29, 2019, Zakaria purportedly issued a prescription in the name of JW that was provided to the Defendants for a cervical posture pump, despite Zakaria not performing a follow-up examination or any other service on JW on that day. On November 4, 2019, Zakaria purportedly issued the following prescription in the name JW that was provided to the Defendants: (i) an infrared lamp; (ii) a massager; (iii) a TENS unit; and a (iv) a TENS belt, despite Zakaria not performing a follow-up examination or any other service on JW on that day. On November 18, 2019, after a purported follow-up examination with Zakaria, Zakaria purportedly issued a prescription in the name of JW that

was provided to another DME/OD supplier for a "LSO w/APL control custom".

(vi)    On September 24, 2019, an Insured named AM was purportedly involved in a motor vehicle accident. AM purportedly started treating at the Ralph Ave. Clinic on or around September 24, 2019.  After Igbokwe purportedly performed an initial examination on AM, Igbokwe purportedly issued a prescription in the name of AM that was provided to another DME/OD supplier that included the following Fraudulent Equipment: (i) a general use cushion (wide); (ii) a lumbar sacral support; (iii) a bed board; (iv) an eggcrate mattress; (v) a cervical collar; (vi) cervical pillow; and (vi) a water heat pump.  On October 28, 2019, Zakaria purportedly issued the two separate prescriptions in the name of AM that were provided to the Defendants, despite Zakaria not performing a follow-up examination or any other service on AM on that day.  One prescription purportedly issued by Zakaria was for: (i) an infrared lamp; (ii) a massager; (iii) a TENS unit; a (iv) a TENS belt; and (v) a whirlpool. The other prescription purportedly issued by Zakaria was for a "shoulder orthosis – R".  On November 11, 2019, Zakaria purportedly issued a prescription in the name of AM that was provided to the Defendants for a "LSO w/APL control custom", despite Zakaria not performing a follow-up examination or any other service on AM on that day. On November 18, 2019, Zakaria purportedly issued a prescription in the name of AM that was provided to the Defendants for a "K.O. (custom fitted) – R", despite Zakaria not performing a follow-up examination or any other service on AM on that day. On December 16, 2019, Caruso purportedly issued a prescription in the name of AM that was provided to another DME/OD supplier for a "cervical posture pump", despite Caruso not performing a follow-up examination or any other service on AM on that day.

(vii)   On September 28, 2019, an Insured named VT was purportedly involved in a motor vehicle accident. VT purportedly started treating at the Ralph Ave. Clinic on or around October 1, 2019.  After Raia purportedly performed an initial examination on VT, Raia purportedly issued a prescription in the name of VT that was provided to another DME/OD supplier that included the following Fraudulent Equipment: (i) a general use cushion (wide); (ii) a lumbar sacral support; (iii) a bed board; (iv) an eggcrate mattress; (v) a cervical collar; (vi) a cervical pillow; (vii) a heating pad; and (viii) a water heat pump.  On November 11, 2019, Zakaria purportedly issued the two separate prescriptions in the name of VT that were provided to the Defendants, despite Zakaria not performing a follow-up examination or any other service on VT on that day.  One prescription purportedly issued by Zakaria was for: (i) an infrared lamp; (ii) a massager; (iii) a TENS unit; a (iv) a TENS belt; and (v) a whirlpool. The other prescription purportedly issued by Zakaria was for a "shoulder orthosis – L".  On February 5, 2020, Caruso purportedly issued a prescription in the name of VT that was

provided to the Defendants for: (i) a "cervical posture pump"; and (ii) "LSO w/APL control custom", despite Caruso not performing a follow-up examination or any other service on VT on that day.

(viii)   On October 6, 2019, an Insured named MW was purportedly involved in a motor vehicle accident. MW purportedly started treating at the Ralph Ave. Clinic on or around October 7, 2019.  After Zakaria purportedly performed an initial examination on MW, Zakaria purportedly issued a prescription in the name of MW that was provided to the Defendants that included the following Fraudulent Equipment: (i) a general use cushion (wide); (ii) a lumbar sacral support; (iii) a bed board; (iv) an eggcrate mattress; (v) a cervical collar; (vi) a cervical pillow; (vii) a heating pad; (vii) a water heat pump; (ix) an orthopedic car seat; and (x) an arm sling.  On October 15, 2019, Zakaria purportedly issued a prescription in the name of MW that was both provided to the Defendants for a "shoulder orthosis – L", despite Zakaria not performing a follow-up examination or any other service on MW on that day.  On November 11, 2019, Zakaria purportedly issued a prescription in the name of MW that was provided to the Defendants for: (i) an infrared lamp; (ii) a massager; (iii) a TENS unit; a (iv) a TENS belt; and (v) a whirlpool, despite Zakaria not performing a follow-up examination or any other service on MW on that day.

(ix)    On October 12, 2019, an Insured named AS was purportedly involved in a motor vehicle accident. AS purportedly started treating at the Ralph Ave. Clinic on or around October 15, 2019.  After Zakaria purportedly performed an initial examination on AS, Zakaria purportedly issued a prescription in the name of AS that was provided to the Defendants that included the following Fraudulent Equipment: (i) a general use cushion (wide); (ii) a lumbar sacral support; (iii) a bed board; (iv) an eggcrate mattress; (v) a cervical collar; (vi) a cervical pillow; (vii) a heating pad; (vii) a water heat pump; (ix) an orthopedic car seat; (x) an arm sling; and (xi) a knee brace. On November 11, 2019, Zakaria purportedly issued a prescription in the name of AS that was provided to the Defendants for: (i) an infrared lamp; (ii) a massager; (iii) a TENS unit; and (iv) a TENS belt, despite Zakaria not performing a follow-up examination or any other service on AS on that day. On December 16, 2019, Zakaria purportedly issued a prescription in the name of AS that was provided to the Defendants for: (i) a whirlpool; and (ii) a "shoulder orthosis – R", despite Zakaria not performing a follow-up examination or any other service on AS on that day.  On February 5, 2020, following a purported visit with Caruso, Caruso issued a prescription in the name of AS that was provided to the Defendants for: (i) "cervical traction"; and (ii) "LSO w/APL control".

(x)    On October 22, 2019, an Insured named SS was purportedly involved in a motor vehicle accident. SS purportedly started treating at the Ralph Ave. Clinic on or around November 4, 2019.   After Zakaria purportedly

performed an initial examination on SS, Zakaria purportedly issued a prescription in the name of SS that was provided to the Defendants that included the following Fraudulent Equipment: (i) a general use cushion (wide); (ii) a lumbar sacral support; (iii) a bed board; (iv) an eggcrate mattress; (v) a cervical collar; (vi) a cervical pillow; (vii) a heating pad; (vii) a water heat pump; (ix) an orthopedic car seat (x) a knee brace; and (xi) an arm sling.   On November 18, 2019, Zakaria purportedly issued a prescription in the name of SS that was provided to another DME/OD supplier for a "cervical posture pump", despite Zakaria not performing a follow-up examination or any other service on SS on that day. On December 2, 2019, Zakaria purportedly issued a prescription in the name of SS that was provided to the Defendants for: (i) an infrared lamp; (ii) a massager; (iii) a TENS unit; (iv) a TENS belt; and (v) a whirlpool, despite Zakaria not performing a follow-up examination or any other service on SS on that day. On December 16, 2019, Zakaria purportedly issued two separate prescriptions in the name of SS that were both provided to another DME/OD supplier for: (i) a "LSO w/APL control custom"; and (ii) a "shoulder orthosis – L", despite Zakaria not performing a follow-up examination or any other service on SS on that day.

191.    These are only representative samples. In fact, virtually all of the Insureds identified in Exhibit "1" that received treatment at the Ralph Ave. Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocol established at the Ralph Ave. Clinic.

192.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the Ralph Ave. Clinic were medically unnecessary and issued pursuant to a predetermined fraudulent protocol, an overwhelming majority of the Insureds who treated at the Ralph Ave. Clinic received multiple prescriptions for virtually the same type of Fraudulent Equipment, similar to the examples above, despite the fact that they were involved in relatively minor and low-impact motor vehicle accidents.

193.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the Ralph Ave. Clinic were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, the contemporaneous initial examination reports

did not contain any sufficient information to explain why the healthcare providers prescribed any of the Fraudulent Equipment, and virtually always failed to identify all the Fraudulent Equipment that was prescribed.

194.    Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, to the extent that prescriptions for Fraudulent Equipment were contemporaneously dated with follow-up examinations, the Referring Providers' follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment.

195.    Even more, and in keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, when the Insureds continued to seek treatment at the Ralph Ave. Clinic, the follow-up examination reports generated by the Referring providers virtually never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of previously prescribed Fraudulent Equipment.

196.    In further keeping with the fact that each prescription for Fraudulent Equipment issued by Referring Providers at the Ralph Ave. Clinic was not medically necessary and was issued pursuant to a predetermined fraudulent protocol, virtually all of the prescriptions for cervical collars, lumbosacral supports, and knee or shoulder supports routinely contravened the Insureds' conservative treatment plans. For example, Insureds were systemically prescribed cervical collars, lumbosacral supports, and occasionally knee or shoulder supports, which immobilize the patient, while simultaneously directing the Insureds to undergo physical therapy regimens, which would require prolonged bending and stretching of weakened parts of the body, including the spine,

shoulders, or knees. In this context, the prescriptions for cervical collars, lumbosacral supports, shoulder, and knee support braces completely contravened the mobilizing physical therapy treatments also prescribed by the same healthcare provider. No legitimate treatment regimen would involve the simultaneous prescription of mobilizing physical therapy and immobilizing devices.

197.    Furthermore, and in keeping with the fact that the prescriptions issued by Referring Providers at the Ralph Ave. Clinic to the Insureds identified in Exhibit "1" were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, the vast majority of prescriptions purportedly issued by Zakaria, Igbokwe, Raia, and Caruso contained photocopied signatures, or the use of a signature stamp.

198.    Additionally, the prescriptions purportedly issued by Referring Providers at the Ralph Ave. Clinic were never given to the Insureds but were routed directly to the Defendants and other DME/OD suppliers, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Ralph Ave. Clinic, without any interaction with or instruction concerning their use from the Defendants, other DME/OD suppliers, or a healthcare provider.

199.    Additionally, as part of the fraudulent scheme, the prescriptions purportedly issued by Referring Providers at the Ralph Ave. Clinic were purposefully generic and vague, which allowed the Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

200.    By way of example, rather than specifying the type of cervical collar and lumbosacral support that patients should receive by providing a specific HCPCS Code – or a

detailed description that could only be associated with one type of HCPCS Code – the Referring Providers at the Ralph Ave. Clinic, purported to issue prescriptions containing the phrases "cervical collar" , "lumber sacral support", "knee brace", or "shoulder orthosis" that enabled the Defendants to select a specific type of support that was more highly priced and profitable, instead of issuing prescriptions for support braces that were actually needed in the first instance, to the extent they were actually needed at all.

     E.     **The Unlawful Distribution of Fraudulent Equipment to Insureds by the Defendants Without Valid Prescriptions**

201.     Med Supply is not a licensed medical professional corporation, and Malinin is not a licensed healthcare provider. As such, the Defendants were not lawfully permitted to prescribe DME and OD to Insureds. For the same reason, the Defendants cannot properly dispense DME and/or OD to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies the DME and/or OD to be provided.

202.     However, in many of the fraudulent claims identified in Exhibit "1", the Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider to the extent that they actually provided any DME or OD to the Insureds.

203.     More specifically, the prescriptions for DME and/or OD purportedly issued by the Referring Providers and provided to the Defendants were vague and generic because the prescriptions did not definitively identify the DME and/or OD to be provided. For example, the vague and generic prescriptions did not: (i) provide a specific HCPCS Code for the DME and/or OD to be provided; or (ii) provide sufficient detail to direct the Defendants to a unique type of DME and/or OD.

204. To the extent that some of the fraudulent claims identified in Exhibit "1" were based upon prescriptions that contained HCPCS Codes next to the descriptions of DME and/or OD, the Defendants still improperly decided what DME and OD to provide Insureds because the prescriptions were vague as the HCPCS Code identified on the prescription did not correspond with the description next to the code.

205. Even more, in many of the fraudulent claims identified in Exhibit "1", the Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider because the Defendants provided Fraudulent Equipment that was not identified on the prescription.

206. The vague and generic prescriptions purportedly issued by the Referring Providers were intended to and actually provided the Defendants the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Medicaid Fee Schedule, as part of their scheme with others who are presently unidentifiable.

207. In a legitimate clinical setting, a DME/OD retailer would contact the referring healthcare provider to request clarification on the specific items that were being requested, including the features and requirements in order to dispense the appropriate DME and/or OD prescribed to each patient.

208. Upon information and belief, the Defendants never contacted the referring healthcare provider to seek instruction and/or clarification, but rather made their own determination as to the specific Fraudulent Equipment purportedly provided to each Insured. Not surprisingly, the Defendants elected to provide the Insureds with Fraudulent Equipment that had a reimbursement rate at the higher end of the permissible range under the Medicaid Fee Schedule.

209.   For example, many of the prescriptions that were used by the Defendants to support the charges identified in Exhibit "1" contained a vague description of a "lumber sacral support" or "LSO/LS Support". However, this vague and generic language directly relates to the over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds, including:

(i)    HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $43.27.

(ii)   HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

(iii)  HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

(iv)   HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $65.92.

(v)    HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

(vi)   HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(vii)  HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $ 806.64.

(viii) HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $ 1150.00.

(ix)   HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(x)    HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xi)     HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xii)    HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xiii)   HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiv)    HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xv)     HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xvi)    HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xvii)   HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xviii)  HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xix)    HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xx)     HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxi)    HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxii)   HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxiii) HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

210.    As unlicensed healthcare providers, the Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured based upon a vague prescription for a "lumber sacral support" or "LSO/LS Support".

211.    However, upon information and belief, the Defendants never contacted the Referring Provider, and instead decided themselves which specific type of Fraudulent Equipment they would bill GEICO for, and accordingly purportedly provide the Insureds based upon the vague and generic prescriptions for Fraudulent Equipment.

212.    In fact, each and every time that the Defendants received a prescription from the Referring Providers for a "lumber sacral support" or "LSO/LS Support" the Defendants billed GEICO using HCPCS Code L0627 requesting a reimbursement of $322.98, and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to GEICO.

213.    Furthermore, each and every time that the Defendants received a prescription from the Referring Providers for a "LSO w APL control", the Defendants billed GEICO using HCPCS Code L0631 requesting a reimbursement of $806.64, and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to GEICO.

214.    These are only representative examples. To the extent that the Defendants actually provided Fraudulent Equipment, they unlawfully prescribed the Fraudulent Equipment for virtually all of the claims identified in Exhibit "1" that are based upon vague and generic prescriptions because the Defendants decided which specific items of DME and/or OD to provide to the Insureds.

215.    The Fraudulent Equipment provided to the Insureds identified in Exhibit "1" – to the extent that the Fraudulent Equipment was actually provided – by the Defendants was not based on: (i) prescriptions by licensed healthcare providers containing sufficient detail to identify unique types DME and/or OD; or (ii) the medical necessity of the specific items dispensed in relation to the Insureds. Rather, the Fraudulent Equipment identified in Exhibit "1" were the result of decisions by the Defendants.

216.    In all of the claims identified in Exhibit "1" that were based upon vague and generic language contained in the prescriptions, the Defendants falsely represented that the Fraudulent Equipment purportedly provided to Insureds was based upon prescriptions for reasonable and medically necessary DME and/or OD issued by healthcare providers with lawful authority to do so. To the contrary, the Fraudulent Equipment was purportedly provided by the Defendants own determination of what unique types of Fraudulent Equipment to purportedly provide, and, thus, was not eligible for reimbursement of PIP Benefits.

**F.    The Defendants' Fraudulent Billing for DME and/or OD**

217.    The bills submitted to GEICO and other New York automobile insurers by the Defendants were also fraudulent in that they misrepresented the DME and OD purportedly provided to the Insureds.

218.    In the bills and other documents submitted to GEICO, the Defendants misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols at each Clinic that the Defendants obtained pursuant to arrangements, including financial arrangements, with others who are not presently identifiable.

219.     Further, the Defendants misrepresented in the bills submitted to GEICO that the Fraudulent Equipment purportedly provided to Insureds were based upon prescriptions issued by licensed healthcare providers authorized to issue such prescriptions, when the Fraudulent Equipment purportedly provided were based upon decisions made by laypersons.

220.     Moreover, and as explained below, the bills submitted to GEICO by the Defendants misrepresented that: (i) Fraudulent Equipment was provided to Insureds; (ii) to the extent that any Fraudulent Equipment was provided, the Fee Schedule items matched the HCPCS Codes identified in the bills to GEICO when they did not; and (iii) to the extent that any Fraudulent Equipment was provided, the charges for Non-Fee Schedule items were for permissible reimbursement rates when they were not.

### 1)     The Defendants' Fraudulently Misrepresented that Fraudulent Equipment Was Provided

221.     When the Defendants submitted bills to GEICO and other New York automobile insurers, they represented that Fraudulent Equipment was actually provided to the Insureds. However, many of the bills for Fraudulent Equipment misrepresented that Fraudulent Equipment was provided to the Insureds because – in reality – the Insureds never received the Fraudulent Equipment billed to GEICO by the Defendants.

222.     As part of the Defendants' plan to maximize the billing submitted to GEICO for No-Fault Benefits, and as set forth above, the Defendants obtained prescriptions purportedly issued by the Referring Providers for medically unnecessary Fraudulent Equipment which were used as the basis for bills to GEICO.

223.     The Defendants knew that, without billing for products that they did not provide to Insureds, they would be unable to maximize the amount of money they could receive from GEICO.

224.    Therefore, the Defendants created a deceptive scheme where they would submit bills GEICO for both Fraudulent Equipment that they did not provide to the Insureds and Fraudulent Equipment that they did provide to the Insureds.

225.    By concealing the bills for both Fraudulent Equipment that they did not provide and Fraudulent Equipment that they did provide, the Defendants purposefully created a false appearance of legitimacy about the Fraudulent Equipment they purportedly provided in order to hide their deceptive scheme.

226.    Accordingly, in many of the claims identified within Exhibit "1", the Defendants submitted bills for Fraudulent Equipment that was never actually provided to the Insureds.

227.    For all of the bills submitted to GEICO for the claims identified in Exhibit "1", the Defendants submitted a "delivery receipt", which identified specific Fraudulent Equipment that the Insureds purportedly received, and was used as a basis to corroborate the charges contained on each bill to GEICO.

228.    Each delivery receipt included in the bills submitted to GEICO by the Defendants to support the charges identified in Exhibit "1" contained, among other things: (i) the printed name of the Insured; (ii) the signature of the Insured; (iii) the date the Insured signed the delivery receipt; and (iv) an itemization of the specific Fraudulent Equipment purportedly received by the Insured.

229.    In keeping with the fact that the Defendants submitted bills for Fraudulent Equipment that were never actually provided to the Insureds, the Defendants frequently submitted bills to GEICO containing photocopied delivery receipts.

230.    In keeping with the fact that the delivery receipts submitted by the Defendants were photocopied and fraudulently misrepresented that Fraudulent Equipment was provided to the Insureds, the Defendants would submit multiple bills to GEICO for Fraudulent Equipment

purportedly provided to a single Insured, many times on the same date, when the delivery receipts attached to each bill identified different Fraudulent Equipment but contained an <u>identical</u> handwritten signature by the Insured.

231.    In keeping up with the fact that the Defendants fraudulently misrepresented that Fraudulent Equipment was provided to insureds, there is no legitimate reason why the Defendants would submit multiple bills for different types of Fraudulent Equipment provided to a single Insured on a single date.

232.    Similarly, there is no legitimate reason why Insureds would need to sign two or more different delivery receipts for Fraudulent Equipment purportedly provided on the same day from the same DME/OD supplier.

233.    In reality, part of the fraudulent scheme involving others who are not presently identifiable, involved the Defendants (i) obtaining a delivery receipt from each Insured that included the Insured's signature; and (ii) then photocopying the delivery receipt and changing the items purportedly delivered to Insureds in order to submit bills to GEICO for Fraudulent Equipment that appear legitimately provided to Insureds when the Fraudulent Equipment was never actually provided.

234.    For example:

> (i)     On March 9, 2019, an Insured named GF was purportedly injured in a motor vehicle accident. On May 24, 2019, Med Supply purportedly provided GF with a shoulder immobilizer and submitted a bill to GEICO seeking $141.41 in No-Fault Benefits.   On August 12, 2019, Med Supply purportedly provided GF with an EMS unit, EMS belt, massager, and infrared heat lamp, and submitted a bill to GEICO seeking $494.25 in No-Fault Benefits.  Also on August 12, 2019, Med Supply purportedly provided GF with a whirlpool, and submitted a separate bill to GEICO seeking $428.00.  Attached to each of the above-mentioned bills was a delivery receipt that identified the items purportedly provided to GF and contained GF's handwritten signature. However, the three delivery receipts for GF submitted by the Defendants to

GEICO contained identical handwritten signatures by GF but identified different types of Fraudulent Equipment that was purportedly provided.

(ii)     On May 15, 2019, an Insured named MY was purportedly injured in a motor vehicle accident. On May 30, 2019, Med Supply purportedly provided MY with a cervical collar, cervical pillow, electric heat pad, lumbar orthosis, lumbar cushion, orthopedic car seat, bed board, and egg crate mattress and submitted a bill to GEICO seeking $881.65 in No-Fault Benefits.  Also on May 30, 2019, Med Supply purportedly provided MY with a shoulder immobilizer and submitted a separate bill to GEICO seeking $141.41. Attached to each of the above-mentioned bills was a delivery receipt that identified the items purportedly provided to MY and contained MY's handwritten signature. However, the two delivery receipts for MY submitted by the Defendants to GEICO contained identical handwritten signatures by MY but identified different types of Fraudulent Equipment that was purportedly provided. On July 10, 2019, Med Supply purportedly provided MY with an EMS unit, EMS belt, massager, and infrared heat lamp, and submitted a bill to GEICO seeking $494.25.  Also on July 10, 2019, Med Supply purportedly provided MY with a whirlpool and submitted a separate bill to GEICO seeking $428.00. Attached to each of the above-mentioned bills was a delivery receipt that identified the items purportedly provided to MY and contained MY's handwritten signature. However, the two delivery receipts for MY submitted by the Defendants to GEICO contained identical handwritten signatures by MY but identified different types of Fraudulent Equipment that was purportedly provided.

(iii)    On May 18, 2019, an Insured named SS was purportedly injured in a motor vehicle accident. On May 30, 2019, Med Supply purportedly provided SS with a shoulder immobilizer and submitted a bill to GEICO seeking $141.41 in No-Fault Benefits.  On July 10, 2019, Med Supply purportedly provided SS with an EMS unit, EMS belt, massager, and infrared heat lamp, and submitted a bill to GEICO seeking $494.25.  Also on July 10, 2019, Med Supply purportedly provided SS with a whirlpool and submitted a separate bill to GEICO seeking $428.00.  Attached to each of the above-mentioned bills was a delivery receipt that identified the items purportedly provided to SS and contained SS's handwritten signature. However, the three delivery receipts for SS submitted by the Defendants to GEICO contained identical handwritten signatures by SS but identified different types of Fraudulent Equipment that was purportedly provided.

(iv)     On October 3, 2019, an Insured named JD was purportedly injured in a motor vehicle accident. On October 18, 2019, Med Supply purportedly provided JD with a cervical car collar, cervical pillow, orthopedic car seat, bed board, and egg crate mattress, and submitted a bill to GEICO seeking $491.39 in No-Fault Benefits.  Also on October 18, 2019, Med Supply purportedly provided JD with a shoulder support and submitted a separate bill to GEICO seeking $141.14.  Also on October 18, 2019, Med Supply

purportedly provided JD with a water circulating heat pad with pump and submitted a separate bill to GEICO seeking $424.00. Attached to each of the above-mentioned bills was a delivery receipt that identified the items purportedly provided to JD and contained JD's handwritten signature. However, the three delivery receipts for JD submitted by the Defendants to GEICO contained identical handwritten signatures by JD but identified different types of Fraudulent Equipment that was purportedly provided. On November 22, 2019, Med Supply purportedly provided JD with an EMS unit, EMS belt, massager, and infrared heat lamp, and submitted a bill to GEICO seeking $494.25 in No-Fault Benefits. Also on November 22, 2019, Med Supply purportedly provided JD with a whirlpool and submitted a separate bill to GEICO seeking $428.00. Attached to each of the above-mentioned bills was a delivery receipt that identified the items purportedly provided to JD and contained JD's handwritten signature. However, the two delivery receipts for JD submitted by the Defendants to GEICO contained identical handwritten signatures by JD but identified different types of Fraudulent Equipment that was purportedly provided.

(v)    On October 4, 2019, an Insured named MA was purportedly injured in a motor vehicle accident. On December 3, 2019, Med Supply purportedly provided MA with an EMS unit, EMS belt, massager, and infrared heat lamp, and submitted a bill to GEICO seeking $494.25 in No-Fault Benefits. Also on December 3, 2019, Med Supply purportedly provided MA with a whirlpool and submitted a separate bill to GEICO seeking $428.00. Attached to each of the above-mentioned bills was a delivery receipt that identified the items purportedly provided to MA and contained MA's handwritten signature. However, the two delivery receipts for MA submitted by the Defendants to GEICO contained identical handwritten signatures by MA but identified different types of Fraudulent Equipment that was purportedly provided.

(vi)   On October 17, 2019, an Insured named JC was purportedly injured in a motor vehicle accident. On November 7, 2019, Med Supply purportedly provided JC with a lumbar cushion, lumbar orthosis, and electric heat pad, and submitted a bill to GEICO seeking $390.30 in No-Fault Benefits. On December 6, 2019, Med Supply purportedly provided JC with an EMS unit, EMS belt, massager, infrared heat lamp, and whirlpool, and submitted a bill to GEICO seeking $922.25. Attached to each of the above-mentioned bills was a delivery receipt that identified the items purportedly provided to JC and contained JC's handwritten signature. However, the two delivery receipts for JC submitted by the Defendants to GEICO contained identical handwritten signatures by JC but identified different types of Fraudulent Equipment that was purportedly provided.

(vii)  On October 30, 2019, an Insured named GA was purportedly injured in a motor vehicle accident. On January 8, 2020, Med Supply purportedly provided GA with an EMS unit, EMS belt, massager, and infrared heat

lamp, and submitted a bill to GEICO seeking $494.25 in No-Fault Benefits. Also on January 8, 2020, Med Supply purportedly provided GA with a whirlpool and submitted a separate bill to GEICO seeking $428.00. Attached to each of the above-mentioned bills was a delivery receipt that identified the items purportedly provided to GA and contained GA's handwritten signature. However, the two delivery receipts for GA submitted by the Defendants to GEICO contained identical handwritten signatures by GA but identified different types of Fraudulent Equipment that was purportedly provided.

(viii)    On December 2, 2019, an Insured named OS was purportedly injured in a motor vehicle accident. On December 12, 2019, Med Supply purportedly provided OS with a cervical collar, cervical pillow, electric heat pad, lumbar orthosis, lumbar cushion, orthopedic car seat, bed board, egg crate mattress, knee orthosis, and shoulder support and submitted a bill to GEICO seeking $1,388.96 in No-Fault Benefits. On February 4, 2020, Med Supply purportedly provided OS with an EMS unit, EMS belt, massager, infrared heat lamp, and whirlpool, and submitted a bill to GEICO seeking $922.25. Attached to each of the above-mentioned bills was a delivery receipt that identified the items purportedly provided to OS and contained OS's handwritten signature. However, the two delivery receipts for OS submitted by the Defendants to GEICO contained identical handwritten signatures by OS but identified different types of Fraudulent Equipment that was purportedly provided.

(ix)    On December 8, 2019, an Insured named DD, Jr. was purportedly injured in a motor vehicle accident. On December 23, 2019, Med Supply purportedly provided DD, Jr. with a knee orthosis and submitted a bill to GEICO seeking $208.13 in No-Fault Benefits.  On January 21, 2020, Med Supply purportedly provided DD, Jr. with an EMS unit, EMS belt, massager, infrared heat lamp and whirlpool, and submitted a bill to GEICO seeking $922.25. Attached to each of the above-mentioned bills was a delivery receipt that identified the items purportedly provided to DD, Jr. and contained DD, Jr.'s handwritten signature. However, the two delivery receipts for DD, Jr. submitted by the Defendants to GEICO contained identical handwritten signatures by DD, Jr. but identified different types of Fraudulent Equipment that was purportedly provided.

(x)    On December 17, 2019, an Insured named TA was purportedly injured in a motor vehicle accident. On January 3, 2020, Med Supply purportedly provided TA with a cervical collar, cervical pillow, electric heat pad, lumbar orthosis, lumbar cushion, orthopedic car seat, bed board, and egg crate mattress, and submitted a bill to GEICO seeking $881.69 in No-Fault Benefits.  On February 25, 2020, Med Supply purportedly provided TA with an EMS unit, EMS belt, massager, infrared heat lamp, and whirlpool, and submitted a bill to GEICO seeking $922.25.  Attached to each of the above-mentioned bills was a delivery receipt that identified the items purportedly

provided to TA and contained TA's handwritten signature. However, the two delivery receipts for TA submitted by the Defendants to GEICO contained identical handwritten signatures by TA but identified different types of Fraudulent Equipment that was purportedly provided.

235.    These are only representative examples. Many of the claims identified within Exhibit "1" were submitted to GEICO by the Defendants with a delivery receipt that contained an Insured's photocopied signature, and were not actually signed, authorized, or otherwise acknowledged by the Insured.

236.    Upon information and belief, in each of the claims identified within Exhibit "1" that was submitted to GEICO with a delivery receipt containing a photocopied signature, the Defendants never provided the Fraudulent Equipment to the identified in the delivery receipts to the Insureds.

237.    In each of the claims identified within Exhibit "1" that included a delivery receipt containing a photocopied signature, the Defendants fraudulently misrepresented to GEICO that they provided Fraudulent Equipment to the Insureds and were eligible to collect No-Fault Benefits, when the Defendants were never eligible to collect No-Fault Benefits because they never actually provided the Insureds with the Fraudulent Equipment.

 2)    **The Defendants' Fraudulently Misrepresented the Fee Schedule Items Purportedly Provided**

238.    When the Defendants' submitted bills to GEICO seeking payment for Fraudulent Equipment, each of the bills contained HCPCS codes that were used to describe the type of Fraudulent Equipment purportedly provided to the Insureds.

239.    As indicated above, the New York Fee Schedule provides that the Medicaid Fee Schedule is used to determine the amount to pay for Fee Schedule items. The Medicaid Fee Schedule specifically defines the requirements for each HCPCS code used to bill for DME and/or OD.

240.   Additionally, Palmetto provides specific characteristics and requirements that DME and OD must meet in order to qualify for reimbursement under a specific HCPCS code for both Fee Schedule items and Non-Fee Schedule items.

241.   By submitting bills to GEICO containing specific HCPCS Codes the Defendants represented that Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

242.   However, except for codes relating to positioning pillows/cushions under HCPCS Code E0190 and electric heating pads under HCPCS Code E0215, in virtually all of the bills submitted to GEICO for Fee Schedule items, the Defendants fraudulently represented to GEICO that the HCPCS Codes were accurate and appropriate for the Fee Schedule items purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

243.   The prescriptions from the healthcare providers contained vague and generic terms for Fraudulent Equipment to be provided to the Insureds. By contrast, the Defendants' submitted bills to GEICO containing HCPCS codes that represented a more expensive tier of Fee Schedule items than necessary and that could be provided based upon the type of equipment identified in the vague and generic prescriptions.

244.   As indicated above, as part of the unlawful financial arrangements between the Defendants and others who are not presently identifiable, the Defendants were provided with prescriptions purportedly issued by the Referring Providers pursuant to predetermined fraudulent protocols, which provided the Defendants with the opportunity to increase the amount they could bill GEICO for Fraudulent Equipment purportedly provided to the Insureds.

245.    Accordingly, the Defendants obtained vague and generic prescriptions for Fraudulent Equipment that permitted them to choose between multiple types of products that would fit the vague description contained on the prescription.

246.    Although several options were available to the Defendants based upon the vague and generic prescriptions, the Defendants virtually always billed GEICO – and likely other New York automobile insurers – using HCPCS Codes with higher reimbursement amounts than necessary, which was done so for their financial benefit.

247.    However, despite billing for Fee Schedule items using HCPCS Codes that had higher than necessary reimbursement amounts, to the extent that the Defendants provided any Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO severely misrepresented the type of Fee Schedule items purportedly provided to the Insureds.

248.    As set forth in Exhibit "1", Defendants frequently submitted bills to GEICO for Fraudulent Equipment that was purportedly "custom fitted" for each Insured when – to the extent that the Fraudulent Equipment was actually provided to the Insureds – the Defendants never customized the Fraudulent Equipment as billed.

249.    For example, as identified in the claims contained within Exhibit "1", the Defendants used the prescriptions to bill GEICO for the following HCPCS Codes: (i) L0627 with a charge of $322.98 per unit; (ii) L0631 with a charge for $806.64 per unit; (iii) L0637 with a charge for $844.13 per unit; (iv) L1832 with a charge of $607.55 per unit; and (v) L3674 with a charge for $896.92 per unit.

250.    However, the bills to GEICO for HCPCS Codes L0627, L0631, L0637, L1832, and L3674 fraudulently misrepresented the type of Fraudulent Equipment the Defendants purportedly provided to Insureds as the OD the Defendants provided – to the extent that the Fraudulent

Equipment was actually provided – were not reimbursable under the specific HCPCS Codes billed to GEICO.

251.    The products assigned to HCPCS Codes L0627, L0631, L0637, L1832, and L3674 are a different type of OD that have been customized to fit a specific patient by an individual with expertise.

252.    However, despite billing GEICO – and other New York automobile insurers – using HCPCS Codes L0627, L0631, L0637, L1832, and L3674, the specific orthotic provided by the Defendants – to the extent that the Defendants provided the Insureds with any OD – did not contain the requirements set forth in HCPCS Codes L0627, L0631, L0637, L1832, and L3674 because – at a minimum – the items were never customized to fit each patient.

253.    To the extent that any of the charges identified in Exhibit "1" for custom-fitted OD, including the claims for HCPCS Codes L0627, L0631, L0637, L1832, and L3674, were provided, the Defendants never customized the equipment as required by Palmetto.

254.    In order to help clarify the term "custom fitted", Palmetto defined a custom fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

255.    One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which is for an off-the-shelf orthotic means that "the beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist

(that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training. For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) fall into this category." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

256.    By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

257.    In further keeping with the fact that the Defendants fraudulently misrepresented that they custom fitted OD purportedly provided to Insureds and billed to GEICO, upon information and belief, Malinin is not a certified orthotist.

258.    In the claims identified in Exhibit "1" for custom-fitted OD, including the claims for HCPCS Codes L0627, L0631, L0637, L1832, and L3674, the Defendants fraudulently misrepresented that the Defendants provided the Insureds with OD that was custom-fitted as defined by Palmetto, by a certified orthotist, to the extent that any Fraudulent Equipment was provided to the Insureds.

259.    Instead, to the extent that the Defendants provided any Fraudulent Equipment billed to GEICO as custom-fitted OD, including the charges for HCPCS Codes L0627, L0631, L0637, L1832, L3674, L3702, and L3808, the Defendants dropped off the Fraudulent Equipment without taking any action to custom-fit the OD. To the extent that the Defendants attempted to make any adjustments to the Insureds identified in Exhibit "1" that received custom-fitted OD, the Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

260.    In addition to submitting hundreds of fraudulent charges for custom-fitted OD, the Defendants fraudulently misrepresented other Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – and billed to GEICO in order to maximize profits.

261.    For example, the Defendants regularly submitted charges for $46.39 using HCPCS Code E2619 based upon a prescription for a "lumbar cushion" or "general use cushion (wide)".

262.    However, the product represented by HCPCS Code E2619 is defined as a replacement cover for a wheelchair cushion or back cushion.

263.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E2619, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item in response to the prescriptions for a lumbar cushion or general use cushion – were not replacement covers for a wheelchair cushion or back cushion.

264.    In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibit "1" who were provided with a lumbar cushion or general use cushion by the Defendants that was billed to GEICO under HCPCS Code E2619 were in a wheelchair.

265.     To the extent that any items were actually provided to the Insureds for the charges identified in Exhibit "1" under HCPCS Code E2619, the items were positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

266.     Unlike the fraudulent charges for $46.39 for each lumbar or general use cushion billed under HCPCS Code E2619, the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

267.     In each of the claims identified within Exhibit "1" where the Defendants billed for Fraudulent Equipment under HCPCS Code E2619, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment in response to a prescription for a replacement cover for a wheelchair cushion or back cushion and that item satisfies the requirements of HCPCS Code E2619.

268.     The claims identified in Exhibit "1" for HCPCS Code E0272 is another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

269.     The Defendants routinely submitted charges of $97.50 using HCPCS Code E0272 based upon prescriptions for an "eggcrate mattress."

270.     However, the product represented by HCPCS Code E0272 is defined as a foam rubber mattress, which is an actual mattress, not a mattress pad.

271.     Upon information and belief, by contrast, to the extent that any items were provided, they were mattress pads/toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items listed under HCPCS Code E0199, which is defined as a "Dry pressure pad for mattress, standard mattress length and width."

272. The mattress pads/toppers actually dispensed by the Defendants – to the extent that they provided any mattress pads/toppers to Insureds – have a maximum reimbursement rate of $19.48 for each mattress pad/topper, well below the fraudulent charges submitted to GEICO by the Defendants seeking $97.50 for each unit.

273. In each of the claims identified within Exhibit "1" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0272, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0272.

274. The claims identified in Exhibit "1" for HCPCS Codes E0274 is another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

275. The Defendants routinely submitted charges of $101.85 using HCPCS Code HCPCS Code E0274 pursuant to prescriptions calling for a "bed board."

276. However, the product represented by HCPCS Code E0274 is as an over-bed table and is a table akin to those found in hospitals that permit a bed-bound individual the use of a table while confined to a bed.

277. Upon information and belief, by contrast, to the extent that the Defendants provided any items to Insureds, they were bed boards, or large, flat pieces of cardboard that are put under a mattress to make the mattress firmer and can keep the mattress from sinking. A bed board is listed under HCPCS Code E0273, which is a Non-Fee Schedule Item.

278. In each of the claims identified within Exhibit "1" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0274, each of the bills fraudulently misrepresented that

the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0274.

279.    The claims identified in Exhibit "1" for HCPCS Code T5001 is another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

280.    The Defendants regularly submitted charges for $195.00 using HCPCS Code T5001 based upon prescriptions for an "orthopedic car seat".

281.    However, the product represented by HCPCS Code T5001 is defined as a positioning seat for persons with special orthopedic needs, which is for persons who are unable to rely on their vehicles' built-in restraint systems due to their special orthopedic needs.

282.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code T5001, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not positioning seats for persons with special orthopedic needs, as required by HCPCS Code T5001.

283.    By contrast, to the extent that any items were provided, they were seat pads or cushions, the items were positioning cushions that fall within the Fee Schedule under HCPCS Code E0190, which is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

284.    Unlike the fraudulent charges for $195.00 for each "orthopedic car seat" billed under HCPCS Code T5001, the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

285.    In each of the claims identified within Exhibit "1" where the Defendants billed for Fraudulent Equipment under HCPCS Code T5001, each of the bills fraudulently mispresented that

the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code T5001.

286.    Furthermore, the claims identified in Exhibit "1" for cervical collars under HCPCS Codes L0172 is another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that Fraudulent Equipment were actually provided.

287.    The Defendants routinely submitted charges of $75.00 using HCPCS Code L0172, which is a semi-rigid two-piece cervical collar.

288.    However, despite billing GEICO – and other New York automobile insurers – using HCPCS Code L0172, the specific cervical collars provided by the Defendants – to the extent that the Defendants provided the Insureds with any cervical collars – were not semi-rigid two-piece cervical collars as required under HCPCS Code L0172.

289.    Upon information and belief, the cervical collars provided – to the extent that any were provided – were flexible foam cervical collars that would have been properly billed under HCPCS Code L0120, which is a Fee Schedule item defined as a "cervical, flexible, non-adjustable, prefabricated, off-the-shelf (foam collar)."

290.    By contrast to the fraudulent charges submitted by the Defendants for $75.00 for each cervical collar under HCPCS Code L0172 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement amount of $6.80 for each unit under HCPCS Code L0120.

291.    In each of the claims identified within Exhibit "1" where the Defendants billed for Fraudulent Equipment under HCPCS Code L0172, each of the bills fraudulently mispresented that

the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code L0172.

292.    Similarly, the claims identified in Exhibit "1" for TENS units under HCPCS Codes E0730 is another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that Fraudulent Equipment were actually provided.

293.    However, despite billing GEICO – and other New York automobile insurers – $76.25 for each charge using HCPCS Code E0730, the Defendants never provided Insureds with TENS units, as required under HCPCS Code E0730.

294.    Instead, to the extent that any equipment was provided, the Defendants provided EMS units, which are Non-Fee Schedule items billed under HCPCS Code E0745 and reimbursable at the lesser of 150% of the Defendants' acquisition cost or the price to the general public.

295.    During GEICO's investigation into the Defendants, GEICO was able to observe the EMS units purportedly provided to the Insureds, which was incorrectly billed under HCPCS Code E0730, and observed that the items were low-quality items made in China. GEICO also determined that the exact same low-quality EMS units were available for purchase to the general public on the internet on eBay for $29.99.

296.    In each of the claims identified within Exhibit "1" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0730, each of the bills fraudulently mispresented that the Defendants provided the Insureds with TENS units that satisfies the requirements of HCPCS Code L0730.

297.    With the exception of the claims for HCPCS Codes E0190 and E0215, in each of the claims for Fee Schedule items identified within Exhibit "1", to the extent that any Fraudulent

Equipment was actually provided, the Defendants fraudulently misrepresented the HCPCS Codes identified in their billing to GEICO in order to increase the amount of No-Fault Benefits they could obtain, and where therefore not eligible to collect No-Fault Benefits in the first instance.

> **3)  The Defendants' Fraudulently Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items**

298.    When the Defendants' submitted bills to GEICO for Non-Fee Schedule items the Defendants requested reimbursement rates that were unique and purportedly based upon the specific Fraudulent Equipment purportedly provided to Insureds.

299.    As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

300.    By submitting bills to GEICO for Non-Fee Schedule items, the Defendants represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

301.    However, in virtually all of the charges to GEICO identified in Exhibit "1" for Non-Fee Schedule items, the Defendants fraudulently represented to GEICO that the reimbursement sought was the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

302.    Instead, the Defendants submitted bills to GEICO with charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

303.    The Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent that they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

304.    When the Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of the Defendants' acquisition cost of purportedly high-quality items. In actuality, the Defendants' legitimate acquisition cost for the low-quality items were significantly less.

305.    In an effort to further their scheme, upon information and belief, the Defendants, never researched the cost to the general public of the low-cost and low-quality Non-Fee Schedule items purportedly provided to the Defendants.

306.    In keeping with the fact that the Defendants fraudulently misrepresented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely for their financial benefit, the Defendants purposefully attempted to conceal their effort to overcharge GEICO for Non-Fee Schedule items by virtually never submitting a copy of their acquisition invoices in conjunction with their bills.

307.    As part of their scheme to defraud GEICO and other insurers, Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

308.    Upon information and belief, the Defendants also purposefully avoided researching the cost to the general public of the Non-Fee Schedule items that they purportedly provided because they knew that those items would be sold at significantly less than charges they submitted to GEICO and other automobile insurers.

309.    As part of this scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibit "1" virtually always misrepresented the permissible reimbursement amount.

310.    For example, the Defendants billed GEICO for hundreds of infrared heat lamps under HCPCS Code E0205 with a charge of $205.00 per unit, which falsely represented that the charge was the lesser of 150% of the Defendants' acquisition cost or the price to the general public.

311.    During GEICO's investigation into the Defendants, GEICO was able to examine the infrared heat lamps purportedly provided to the Insureds and billed under HCPCS Code E0205, which were low-quality infrared heat lamps were made in China. GEICO determined that the exact same low-quality model for the infrared heat lamps provided to Insureds was available for purchase to the general public on eBay for $19.99.

312.    In each of the claims identified within Exhibit "1" where the Defendants billed for infrared heat lamps using HCPCS Code E0205, the Defendants fraudulently sought reimbursement for $205.00 per unit when the maximum reimbursement charge was no greater than the cost to the general public at $19.99 per unit.

313.    Similarly, the Defendants billed GEICO for hundreds of water circulating heat pad with pump under HCPCS Code E0217 with a charge of $424.00 per unit, which falsely represented that the charge was the lesser of 150% of the Defendants' acquisition cost or the price to the general public.

314.    During GEICO's investigation into the Defendants, GEICO was able to examine the water circulating heat pad with pumps purportedly provided to the Insureds and billed under HCPCS Code E0217 and observed low-quality items made in China. GEICO also determined that

a virtually identical low-quality model for the water circulating pumps provided to Insureds was available for purchase to the general public on eBay for between $19.95 and $25.99.

315.    In each of the claims identified within Exhibit "1" where the Defendants billed for a water circulating heat pad with pump using HCPCS Code E0217, the Defendants fraudulently sought reimbursement for $424.00 per unit when the maximum reimbursement charge was no greater than the cost to the general public at $25.99 per unit.

316.    The Defendants' also billed GEICO for hundreds of massagers under HCPCS Code E1399 with a charge of $195.00 per unit, which falsely represented that the charge was the lesser of 150% of the Defendants' acquisition cost or the price to the general public.

317.    During GEICO's investigation into the Defendants, GEICO was able to examine the massagers purportedly provided to the Insureds, which was billed under HCPCS Code E1399, and observed low-quality items made in China. GEICO also determined that the exact same low-quality model massagers were available for purchase to the general public on eBay for $29.00.

318.    In each of the claims identified within Exhibit "1" where the Defendants billed for massagers using HCPCS Code E1399 the Defendants fraudulently sought reimbursement for $195.00 per unit when the maximum reimbursement charge was no greater than the cost to the general public at $29.00 per unit.

319.    The Defendants' billed GEICO for hundreds of portable whirlpools under HCPCS Code E1399 with a charge of $248.00 per unit, which falsely represented that the charge was the lesser of 150% of the Defendants' acquisition cost or the price to the general public.

320.    During GEICO's investigation into the Defendants, GEICO was able to examine the portable whirlpools purportedly provided to the Insureds, which was billed under HCPCS Code E1399, and observed the low-quality items made in China. GEICO also determined that the exact

same low-quality portable whirlpools were available for purchase to the general public on Amazon.com for $46.00 or on Walmart.com for $44.98.

321.    In each of the claims identified within Exhibit "1" where the Defendants billed for portable whirlpools using HCPCS Code E1399 the Defendants fraudulently sought reimbursement for $428.00 per unit when the maximum reimbursement charge was no greater than the cost to the general public at $46.00 per unit.

322.    In each of the claims identified within Exhibit "1" for Non-Fee Schedule items, the Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges for Non-Fee Schedule items were the lesser of 150% of the acquisition cost or the cost to the general public, and where therefore not eligible to collect No-Fault Benefits in the first instance.

## III.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

323.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of Med Supply, seeking payment for Fraudulent Equipment.

324.    The NF-3 forms, HCFA-1500 forms and treatment reports that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of Fraudulent Equipment, they were not properly licensed by the DCA as they falsified the information contained in their application for a Dealer for Products License.

(ii)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and

delivery receipts uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with others who are not presently identifiable; (b) prescriptions issued pursuant to predetermined fraudulent protocols without regard for the medical necessity of the items; and (c) decisions made by laypersons not based upon lawful prescriptions from licensed healthcare providers for medically necessary items.

(iii)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that Fraudulent Equipment was provided to the Insureds, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because the charges identified in the NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts falsified that Fraudulent Equipment was actually provided to Insureds.

(iv)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms, HCFA-1500 forms, prescriptions, treatment notes, and delivery receipts.

(v)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that the Defendants provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – the bills falsified that the charges to GEICO were less than or equal to the maximum permissible reimbursement amount for Non-Fee Schedule items identified in the NF-3 forms, HCFA-1500 forms, prescriptions, treatment notes, and delivery receipts.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

325.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

326.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

327.    Specifically, they knowingly misrepresented that they were lawfully licensed by the City of New York as they never complied with regulations requiring Med Supply to obtain a Dealer in Products License from the DCA because they falsely indicated, under penalty for false statements, in the application for a Dealer in Products License the location of Med Supply's business address, and concealed the misrepresentation in order to submit bills to GEICO and prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

328.    They also knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were – not based upon medical necessity but – provided to the Defendants as a result of unlawful financial arrangements, and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

329.    Additionally, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment provided to the Defendants were based upon predetermined fraudulent protocols and without medical necessity in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

330.    Furthermore, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons, without legal authority to issue a prescription, and not by lawful prescriptions issued by an actual healthcare

provider, in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

331.    In addition, the Defendants knowingly misrepresented and concealed that they failed to provide the Fraudulent Equipment to Insureds for which they sought reimbursement from GEICO, and fabricated delivery receipts to make it appear as if the Fraudulent Equipment was actually provided in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

332.    Even more, the Defendants knowingly misrepresented and concealed that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment provided to the Insureds in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

333.    Lastly, the Defendants knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by the Defendants to GEICO and did not include any invoices to support the charges in order to prevent GEICO from discovering that Non-Fee Schedule items were billed to GEICO for financial gain.

334.    Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate.

335.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

336.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

337.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

338.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $114,000.00 based upon the fraudulent charges.

339.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Med Supply**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

340.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 339 of this Complaint as if fully set forth at length herein.

341.    There is an actual case in controversy between GEICO and Med Supply regarding more than $800,000.00 in fraudulent billing that has been submitted to GEICO in the name of Med Supply.

342.    Med Supply has no right to receive payment for any pending bills submitted to GEICO because Med Supply did not comply with all local licensing laws as it falsified its business location on the application for a Dealer in Products License, and thus, was not properly lawfully licensed by the DCA as required by regulations from the City of New York.

343.    Med Supply also has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based – not upon medical necessity but – as a result of its participation in unlawful financial arrangements.

344.    Med Supply has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity – solely to financially enrich the Defendants and others who are not presently known, rather than to treat the Insureds.

345.    Med Supply has no right to receive payment for any pending bills submitted to GEICO because Med Supply purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

346.    Med Supply has no right to receive payment for any pending bills submitted to GEICO because Med Supply fraudulently misrepresented that it provided Fraudulent Equipment to Insureds when the Insureds never received the Fraudulent Equipment billed to GEICO.

347.    Med Supply has no right to receive payment for any pending bills submitted to GEICO because – to the extent Med Supply actually provided any Fraudulent Equipment – Med Supply fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fee Schedule items provided to the Insureds.

348.     Med Supply has no right to receive payment for any pending bills submitted to GEICO because – to the extent Med Supply provided any Fraudulent Equipment – Med Supply fraudulently misrepresented that the charges for Non-Fee Schedule items contained within the bills to GEICO were less than or equal to the maximum permissible reimbursement amount.

349.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Med Supply.

**SECOND CAUSE OF ACTION**
**Against Malinin**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

350.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 339 of this Complaint as if fully set forth at length herein.

351.     Med Supply is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

352.     Malinin knowingly conducted and/or participated, directly or indirectly, in the conduct of Med Supply's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for approximately two years seeking payments that Med Supply was not eligible to receive under the New York No-Fault Laws because: (i) Med Supply was not properly licensed as it failed to have a lawful Dealer in Products License required by regulations from the City of New York; (ii) Med Supply submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii) Med Supply submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based

upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity – that are solely to financially enrich the Defendants and others who are not presently known; (iv) Med Supply submitted bills to GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (v) Med Supply submitted bills to GEICO for Fraudulent Equipment that it never actually provided to Insureds; (vi) to the extent that Med Supply actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the Fee Schedule items actually provided; and (vii) to the extent that Med Supply actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Non-Fee Schedule items. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

353.     Med Supply's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Malinin operates Med Supply, insofar as Med Supply is not engaged as a legitimate supplier of DME and/or OD, and therefore, acts of mail fraud are essential in order for Med Supply to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Malinin continues to submit and attempt collection on the fraudulent billing submitted by Med Supply to the present day.

354.     Med Supply is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These

inherently unlawful acts are taken by Med Supply in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

355.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $114,000.00 pursuant to the fraudulent bills submitted through Med Supply.

356.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
#### Against Malinin and John Doe Defendants 1-10
#### (Violation of RICO, 18 U.S.C. § 1962(d))

357.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 339 of this Complaint as if fully set forth at length herein.

358.    Med Supply is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

359.    Malinin and John Doe Defendants 1-10 are owners of, employed by, or associated with the Med Supply enterprise.

360.    Malinin and John Doe Defendants 1-10 knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Med Supply's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over four years seeking payments that Med Supply was not eligible to receive under the New York No-Fault Laws because: (i) Med Supply was not properly licensed as it failed to have a  lawful Dealer in Products License required by regulations from the City of New York; (ii) Med Supply submitted bills to GEICO for Fraudulent

Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii) Med Supply submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity – that are solely to financially enrich the Defendants and others who are not presently known; (iv) Med Supply submitted bills to GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (v) Med Supply submitted bills to GEICO for Fraudulent Equipment that it never actually provided to Insureds; (vi) to the extent that Med Supply actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the Fee Schedule items actually provided; and (vii) to the extent that Med Supply actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Non-Fee Schedule items. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".  Each such mailing was made in furtherance of the mail fraud scheme.

361.    Malinin and John Doe Defendants 1-10 knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

362.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $114,000.00 pursuant to the fraudulent bills submitted through Med Supply.

363.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Med Supply and Malinin**
**(Common Law Fraud)**

364.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 339 of this Complaint as if fully set forth at length herein.

365.     Med Supply and Malinin intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

366.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that Med Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Med Supply was not lawfully licensed as it knowingly falsified information on its application for a Dealer in Products License; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were obtained by the Defendants as a result of unlawful financial arrangements and not based upon medical necessity, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were issued pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, that

delivery receipts represented that the Insureds received the Fraudulent Equipment when the Insureds were never actually provided with Fraudulent Equipment billed to GEICO by the Defendants; (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fee Schedule items accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact Fee Schedule items did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vii) in many claims, to the extent that any Fraudulent Equipment was actually provided, the charges for Non-Fee Schedule items contained in the bills to GEICO misrepresented the permissible reimbursement amount.

367.    Med Supply and Malinin intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Med Supply that were not compensable under the No-Fault Laws.

368.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $114,000.00 pursuant to the fraudulent bills submitted by the Defendants through Med Supply.

369.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

370.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Med Supply and Malinin**
**(Unjust Enrichment)**

371.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 339 of this Complaint as if fully set forth at length herein.

372.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

373.     When GEICO paid the bills and charges submitted by or on behalf of Med Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

374.     The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

375.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

376.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $114,000.00.

## JURY DEMAND

377.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor:

A.     On the First Cause of Action against Med Supply, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Med Supply has no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of action against Malinin, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $114,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Malinin and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $114,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Med Supply and Malinin, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $114,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

E.      On the Fifth Cause of Action against Med Supply and Malinin, more than $114,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:  September 21, 2021
        Uniondale, New York

                                        RIVKIN RADLER LLP


                                        By:   _/s/ Barry I. Levy_____
                                              Barry I. Levy (BL 2190)
                                              Michael A. Sirignano (MS 5263)
                                              Michael Vanunu (MV 4167)
                                              Philip P. Nash (PN 0519)
                                        926 RXR Plaza
                                        Uniondale, New York 11556
                                        (516) 357-3000

                                        *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*